**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARGARET RUDIN, | Case No. 2:11-cv-00643-RFB-EJY |
| Petitioner, | **ORDER** |
| v. | |
| CAROLYN MYLES,[1] et al., | |
| Respondents. | |

This habeas matter under 28 U.S.C. § 2254 comes before this court for final disposition.

**I.      INTRODUCTION**

Petitioner Margaret Rudin (hereinafter "Petitioner" or "Rudin") challenges her 2001 Nevada state convictions, pursuant to a jury verdict,[2] for first-degree murder with the use of a deadly weapon and unauthorized surreptitious intrusion of privacy by listening device. (ECF No. 71-4.) Rudin is sentenced to two consecutive life sentences with the possibility of parole on each sentence after a minimum of ten years. (Id.)

---

[1] The inmate locator page on the state corrections department's website indicates Rudin is on parole. Should there be any further proceedings in this federal matter, the parties should substitute a proper current respondent in the place of her former physical custodian. The 1976 Advisory Committee Notes to Subdivision (b) of Rule 2 of the Rules Governing Section 2254 Cases suggest the proper respondent for a petitioner who is on parole is "the particular . . . parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate."

[2] Rudin's trial was one of "the longest-running trial[s] . . . in the history of the state of Nevada," commencing on February 26, 2001, and concluding ten weeks later on May 2, 2001. (ECF Nos. 74-8 at 5; 91-19; 69-15.)

On direct appeal, two dissenting justices of the Nevada Supreme Court concluded that a mistrial should have been granted because "it was obvious that the defense was not prepared to try the case" and the primary defense counsel "had a clear conflict of interest with his client." (ECF No. 72-18 at 35.) The majority stated, inter alia, that it shared the dissenters' concern as to counsel's unprofessionalism due to conflicts created by alleged media and literary deals regarding the case. (Id. at 33.) The majority concluded, however, that the issues were better addressed on a post-conviction petition. (Id. at 34.)

On state post-conviction review, the state district court, following an evidentiary hearing, concluded Rudin was denied effective assistance of trial counsel because the defense was not prepared to try the case. (ECF No. 74-11 at 6–8.) On appeal, the Nevada Supreme Court, however, held Rudin's state post-conviction petition was untimely, and the court denied relief for all claims as procedurally defaulted. (ECF No. 75-19.) The untimeliness of the state petition in turn led to the untimely filing of the federal petition, and this court dismissed Rudin's federal petition, holding, inter alia, that Rudin was not entitled to equitable tolling. (ECF No. 15.) Rudin appealed, and a certificate of appealability was granted by the Ninth Circuit. (ECF No. 26 at 21.)

On appeal, although acknowledging that defense counsel "indisputably engaged in egregious professional misconduct during the course of her underlying criminal trial," a panel of the Ninth Circuit affirmed the dismissal, holding that Rudin was not entitled to equitable tolling under the governing law. (ECF No. 23 at 4, 29.) The Ninth Circuit panel ultimately withdrew its earlier opinion, however, and held that Rudin was entitled to equitable tolling of the federal limitation period because, inter alia, her state post-conviction counsel abandoned her for purposes of filing a timely petition and the state district court affirmatively led her to believe the state post-conviction petition was timely filed. (ECF No. 26 at 5, 27, 30.)

On remand, following an independent and <u>de novo</u> review of the record, and with Rudin having been incarcerated for 20 years prior to her current parole, this Court concludes: (1) Rudin can overcome the procedural default of her claims of ineffective assistance of trial counsel under <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), due to inadequate assistance of state post-conviction counsel; and (2) Rudin is entitled to relief on the merits because she was denied effective assistance of counsel at trial in violation of the Sixth and Fourteenth Amendments. This Court therefore will grant a conditional writ of habeas corpus vacating Rudin's convictions, subject to the State's ability to retry Rudin per the conditions and time periods established at the end of this order.

## II.     **BACKGROUND**

### A.     **Factual Background**

The trial evidence tended to establish, <u>inter alia</u>, the following:[3]

#### 1.     **Introduction**

Ronald Rudin (hereinafter "Ron") and Rudin were married in September 1987. (ECF No. 91-24 at 8.) The marriage was the fifth for each of them. (ECF Nos. 65-25 at 112; 69-5 at 40.) Ron was engaged in real estate investment in the Las Vegas area, and Rudin sold antiques. (ECF Nos.

---

[3] This court makes no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court. This court's summary is merely a backdrop to its consideration of the issues presented in the case. Any failure to mention a specific piece of evidence does not signify this court overlooked it in considering Rudin's claims.

This court further notes its review is not being conducted to determine whether the trial evidence was sufficient to sustain a conviction under the standard in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). This court, therefore, does not view the trial evidence in the light most favorable to the prosecution, and does not assume a jury would resolve all competing inferences in favor of the prosecution. Rather, in addressing the issues presented in this case, this court instead looks, when viewing the trial evidence and the other material submitted, at the potential weaknesses in the State's case and the debatable points in that case, as it determines whether, <u>inter alia</u>, "there is a reasonable probability that, but for" Rudin's trial counsel's alleged deficient performance, "the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

66-1 at 16–17; 91-24 at 35.) At the time of Ron's death in 1994, he had been helping Rudin set up an antique store in the strip mall he owned, which was in front of their residence, and where his realty office was located. (ECF No. 66-6 at 53.)

## 2. Ron's Businesses and Personal Dealings

Ron purchased his Lee Canyon property, 165 acres of undeveloped land, in 1981 for $550,000. (ECF No. 67-27 at 9, 47, 81.) Ron parceled the property in 1982 and 1983. (Id. at 81.) In purchasing and parceling this property, Ron used fictitious names.[4] (Id. at 36, 57; see also ECF No. 67-29 at 33.) In 1988 and 1989, Ron attempted unsuccessfully "to raise money to fund a real estate project [at Lee Canyon]" by "gather[ing] investors to invest private money into his project." (ECF No. 68-23 at 7, 21.) Thereafter, Ron looked into subdividing Lee Canyon. (ECF No. 66-3 at 55.) Ron was working on zoning issues with the Lee Canyon property during the year before his death and indicated to a friend who knew his business dealings at Lee Canyon that he was borrowing money from investors in Chicago.[5] (ECF No. 68-17 at 38–40.)

Eugene DeFlorentis,[6] a longtime friend of Ron's who operated a sporting goods and gun store in Ron's strip mall, testified Ron had a concealed weapons permit and carried guns on his person and in his vehicle. (ECF No. 68-18 at 22, 29, 36, 38, 42–43.) Ron owned a large collection of guns, "[e]verything from antique pistols all the way up to submachine guns." (Id. at 42.)

---

[4] The defense presented Terrence Clauretie, a real estate and finance professor, who testified that he reviewed the Lee Canyon property documents and Ron's use of fictitious names in the buying and selling of various portions of the property. (ECF No. 68-23 at 72, 79–80.) Clauretie testified that using fictitious names involved "lots of risks and dangers." (Id. at 80.) Clauretie opined Ron likely used fictitious names in the buying and selling of the property to inflate the property's value. (Id. at 100–101.)

[5] The defense implied those investors were mobsters. (ECF No. 68-17 at 38–39.)

[6] DeFlorentis's voluntary statement from January 24, 1995, and grand jury testimony from March 23, 1995, were read into evidence because he was dead and unavailable to testify at trial. (ECF No. 68-18 at 21, 35.)

1   DeFlorentis also testified Ron was paranoid and had bullet proof glass around his real estate office

2   and an extra alarm system. (Id. at 68.)

3      Sharon Melton, who was employed by Ron as a bookkeeper for his realty business from

4   1985 until his death, testified that in addition to his extensive personal collection, Ron was a gun

5   dealer and had a business named Vegas Gun Traders. (ECF No. 66-3 at 49–50.) Ron also rented

6   properties to tenants,[7] held the mortgages on properties in the Cold Creek area northwest of Las

7   Vegas,[8] and bought, rehabilitated, and sold other properties. (Id. at 52.)

8           **3.     Rudin and Ron's Relationship**

9      Sue Lyles, who worked for Ron from 1989 to 1991, testified she had an affair with Ron

10  from February 1994 until his death in December 1994. (ECF No. 65-27 at 34, 49–50.) Lyles

11  received two letters in December 1994, addressed to Richard and Melissa Lyles, that stated Lyles

12  and Ron were having an affair. (Id. at 55, 61–62.) Lyles believed Rudin wrote the letters to Lyles'

13  children to inform them about the affair because Rudin had previously mistakenly called Lyles's

14  daughter Melissa. (Id. at 33, 41.) On December 17, 1994, Lyles and Ron discussed the letters and

15  the prospect of confronting Rudin about them. (Id. at 67–68.)

16

17

18  [7] As part of the defense theory that law enforcement failed to conduct a thorough investigation of
    other possible suspects, Leonard Castle testified that he called Ron to report that his neighbor,
19  whose house Ron had foreclosed upon, had a messy yard. (ECF No. 68-24 at 155–57.) Castle later
    observed Ron and that neighbor, Bobby Lassiter, arguing about the condition of the house. (Id.)
20  Lassiter, who Castle described as being "a Charles Manson type," confronted Castle about calling
    Ron and "told [Castle] that [he] better watch [his] back and that he would get even." (Id. at 158,
21  160.) To rebut the defense theory of a failure to investigate, a detective testified that he "resolved
    in [his] mind that Mr. Lassister was a non-issue in this matter" because he was not in the Las Vegas
22  area at the time of Ron's disappearance. (Id. at 176, 187.)

23  [8] When law enforcement asked DeFlorentis about any enemies Ron may have had, DeFlorentis
    mentioned Ron's "problems with a homeowners association up in Cold Creek," explaining that
    "they accused him of absconding with lots of homeowners' funds." (ECF No. 68-18 at 69-70.)

Dona Cantrell, Rudin's estranged sister at the time of the trial,[9] testified that Rudin and Ron's relationship between August and December 1994 "seemed troubled" due, in part, to Ron's affair and "some tensions about money." (ECF No. 91-24 at 14–15.) In August 1994, Cantrell asked Rudin if she was thinking of divorcing Ron, and Rudin said she was going to wait due to Ron's poor health. (Id. at 15–16.) Rudin first mentioned Yehuda Sharon to Cantrell in August 1994 and later confided to Cantrell that she was having an affair with Sharon. (Id. at 103–05; ECF No. 66-21 at 11.)

To rebut the State's theory that Rudin and Ron had a contentious relationship, the defense presented Curtis Lynch, Rudin's uncle, who said he saw Rudin and Ron the day before Thanksgiving 1994. (ECF No. 68-23 at 38–39.) Lynch testified Rudin and Ron "were holding hands and just being like a married couple should be." (Id. at 40.) And DeFlorentis testified that Rudin was pleased with the way her store was going and pleased that Ron "was putting everything behind her." (ECF No. 68-18 at 63–64.)

### 4.    Listening Devices

Cantrell testified that Rudin told her in 1991 that she was attempting to listen to Ron's telephone calls. (ECF No. 91-24 at 18.) Rudin was able to listen to Ron's telephone calls because the Rudin residence was located directly behind Ron's strip mall and shared telephone lines with Ron's business. (ECF No. 65-25 at 93, 97.) Cantrell later went with Rudin to a store called the Spy Factory where Rudin purchased some listening devices. (ECF No. 91-24 at 19.) Rudin installed these listening devices in Ron's office without his knowledge. (Id. at 24–25.) An employee of the Spy Factory confirmed Cantrell's story, testifying he recalled Rudin purchasing "[a] wireless

---

[9] Cantrell testified that throughout their lifetimes, she and Rudin had several long periods of estrangement. (ECF Nos. 91-24 at 6, 11; 66-21 at 63, 65.)

transmitter, . . . a receiver which would receive the signals from that transmitter, and a tape recorder" around 1991. (ECF No. 65-25 at 10, 14–15.)

To rebut the contention that the listening devices found in Ron's office belonged to Rudin, the defense presented the testimony of Susan Raesbeck, a former employee of Ron's realty business. (ECF No. 68-23 at 6.) Raesbeck testified Ron recorded conversations in his office and conversations that took place on his business telephone lines. (Id. at 10–11.) Ron explained to Raesbeck that "he would forget things, so he recorded them just for his own refreshment of his memory." (Id. at 10.) The defense also presented the testimony of Barbara Orcutt, a friend of Ron and Rudin, who owned a lodge that Ron frequented near his Lee Canyon property, who testified he told her that he surreptitiously recorded his employees in his office. (ECF No. 68-17 at 14–15.)

### 5.   Ron Goes Missing

The grand opening of Rudin's antique store was the weekend of December 17 and 18, 1994. (ECF No. 66-5 at 8.) Jeanne Nakashima, a defense witness and Rudin's friend, testified she went to the store on Sunday, December 18, 1994, at about 3:30 p.m. and stayed until 4:30 p.m. or 5:00 p.m. (ECF No. 68-17 at 49.) Nakashima returned to Rudin's store around 9:15 p.m. that evening and visited with Rudin until 12:45 a.m. on December 19, 1994. (Id. at 51–53.)

A tenant of the strip mall testified for the State that she saw Rudin pull into a parking spot in the strip mall on December 19, 1994, around at 2:20 a.m. (ECF No. 91-23 at 28–29.) Rudin knocked on the door and asked the tenant, who was working late and had the lights on in her shop, whether she wanted coffee. (Id. at 30–31.) Rudin informed the tenant her husband "did not like her working late at night, so she had waited until he went to sleep before going to [her] antique shop to work." (Id. at 31.) DeFlorentis confirmed Rudin "was more likely to come in and work at

night after the business was closed, especially since they were just pretty much setting up the shop at that time." (ECF No. 68-18 at 26.)

DeFlorentis testified he saw Ron on December 18, 1994, around 5:00 p.m. when Ron popped his head into DeFlorentis' shop. (ECF No. 68-18 at 22.) And Dorothea Flint, a friend of Rudin's, testified she called the Rudin home on December 18, 1994, at 8:10 p.m. and spoke with Ron, who indicated Rudin was not home. (ECF No. 65-26 at 80–82.) Ron failed to show up for work on Monday, December 19, 1994. (ECF No. 66-5 at 23–24.)

Orcutt testified she spoke with Rudin on the telephone on December 19, 1994, in the mid-morning, and Rudin asked[10] Orcutt to get some wranglers and horses together to go to the Lee Canyon property to look for Ron.[11] (ECF No. 68-17 at 9–11.) Orcutt spoke with Rudin five to six times a day on December 19 and 20, 1994, and during those telephone calls, Rudin "was on the verge of tears." (Id. at 13–14.) Similarly, Marena Flores, the Rudins' housekeeper, testified that on December 20, 1994, Rudin "was very sad; she was crying." (ECF No. 66-11 at 89.)

Nakashima testified Rudin came to her residence on the evening of December 19, 1994, and "appeared very quiet, a little upset," and Nakashima learned Ron had not come home the previous night. (ECF No. 68-17 at 56–57.) Nakashima testified her adult son went missing in July 1993, and she was told by law enforcement they take no action for 48 hours. (Id. at 59, 61.) Nakashima testified she told Rudin about this 48-hour rule on the evening of December 19, 1994. (Id. at 61–62.)

---

[10] This testimony was implied since Orcutt was prevented from "go[ing] into the substance of th[e] telephone conversation because that would not be legally correct, exactly what Margaret Rudin said." (ECF No. 68-17 at 10.)

[11] Notably, the defense did not learn about Orcutt's testimony concerning Rudin's request that a search be conducted for Ron following his disappearance until late in the trial, so this fact was not mentioned during the defense's opening statement or used to cross-examine State witnesses who implied Rudin was unconcerned. (ECF No. 74-8 at 11–12.)

The next morning, December 20, 1994, Melton and another employee notified law enforcement that Ron was missing and gave a voluntary statement about their "concerns for [Ron]'s safety, his health and lack of concern from his wife." (ECF No. 66-5 at 41, 43, 45.) After a call from a missing persons investigation officer, Rudin filed a formal missing persons report later that day. (ECF No. 91-23 at 155–59, 161, 174–75.) Regarding Rudin's failure to file a missing persons report sooner, Melton testified she "told the police that Margaret Rudin said that she could not do a missing persons report for 48 hours." (ECF No. 66-7 at 47.) Law enforcement met Rudin on December 22, 1994, and performed a cursory search of the Rudin residence, finding no signs of a struggle and nothing unusual. (ECF No. 91-23 at 192, 195, 197.)[12]

### 6.   The Trust

At his death, Ron's assets were worth between $8,000,000 and $11,000,000. (ECF No. 65-26 at 74.) Ron's wealth was in a trust, which permitted the transmission of his assets upon his death without going through probate court. (ECF No. 91-23 at 252–53.) Rudin's share as a beneficiary of the trust assets was 60 percent. (Id. at 265, 272.) In addition to Rudin, there were three other trust beneficiaries: Harold Boscutti, who had 15 percent; Sharon Cooper, who had 10 percent; and Roman Grinfelds, who had 15 percent. (ECF Nos. 66-1 at 89; 91-23 at 334.) In 1991, Ron had a private directive prepared, which was separate from his trust. (ECF No. 66-10 at 56–57.) Under that directive, the trustees were instructed "to take extraordinary measures to determine the cause of [Ron's] death if his death was a result of some violence." (ECF Nos. 91-23 at 266; 67-31 at 2.) And if any beneficiary of the trust caused Ron's death directly or indirectly, that

---

[12] Detectives received information from three witnesses that Ron was seen at the Oasis Motel on December 18, 1994. (ECF No. 66-27 at 27–28.) Detectives also received information that Ron "was removed from that motel room by two people who they thought were pretending to be police officers." (Id. at 29–30.) Detectives spent portions of a week investigating "bad leads" relating to the Oasis Motel. (ECF No. 85-17 at 295.)

beneficiary was excluded from the trust. (ECF Nos. 65-26 at 14–15, 25; 67-31 at 2.) Ron's estate lawyer, who prepared the directive, testified Ron added the directive because "he had indicated that his wife had made some violent overtures to some employees of his and he was getting quite concerned for his own welfare."[13] (ECF No. 91-23 at 268.)

The trustees were Cooper and Boscutti, who were each beneficiaries. Cooper had a 20-year friendship with Ron at the time of his death. (ECF No. 67-30 at 69.) And Boscutti had worked as a salesman for Ron in 1967 and thereafter became friends. (ECF No. 66-1 at 8–9.) Following Ron's disappearance, pursuant to the directive, the trustees authorized an award for $25,000 for any information regarding Ron's disappearance and hired private investigators, who worked closely with criminal investigators, to investigate Ron's death. (ECF Nos. 67-30 at 85–86; 67-31 at 3.) On December 27, 1994, the trustees signed a certificate of encumbrancy to take control of Ron's business and assets. (ECF No. 67-30 at 72–73.) This included stopping any bills that were being paid by the trust, including for Rudin's vehicle, which was seized, her credit cards, and her means of support. (ECF Nos. 67-31 at 13; 85-17 at 62–65; 66-3 at 31.) When Rudin requested assistance from the trust, it was denied. (ECF No. 85-17 at 61.) Rudin was evicted from her residence on February 1, 1995. (ECF No. 66-3 at 31.)

### 7.   Ron's Vehicle Found

On December 22, 1994, Ron's black Cadillac was found locked, covered with a layer of dust, and parked at the Crazy Horse Too, "a topless bar." (ECF Nos. 66-10 at 117; 66-11 at 9, 17–18.) Three sets of keys, including one for the vehicle, were found in the vehicle along with a set of men's clothing, and "there was dirt and debris on all four floor mats of the vehicle." (ECF No.

---

[13] There was testimony that in 1993 Ron no longer allowed Rudin to enter his realty office before 5:00 p.m. because of safety concerns by an employee. (ECF No. 66-7 at 97.)

66-11 at 20, 25–26.) A crime scene analyst testified "it looked as if dirt or debris was tracked in by someone's shoes who had sat in" each of the vehicle's four seats. (Id. at 23.) Neither Rudin nor Sharon's fingerprints matched those found in Ron's vehicle. (ECF No. 91-27 at 20.)

Ron's ex-wife, Carolyn Rudin, testified Ron was meticulous about his vehicle and kept it spotless, so it was unusual to find it in that condition. (ECF No. 67-27 at 90–91.) DeFlorentis confirmed it was unusual for Ron's vehicle to be dirty. (ECF No. 68-18 at 74.) Regarding the location of Ron's vehicle, DeFlorentis testified he had previously told Boscutti he "would expect [Ron] to call an out call girl or something like that, but not frequent a public establishment like" the Crazy Horse Too. (Id. at 73.) However, Boscutti told DeFlorentis Ron may have known the bookkeeper for the Crazy Horse Too. (Id.)

### 8.     Rudin's Actions After Ron Reported Missing

Cantrell testified Rudin told her that Rudin took a copy of Ron's will and trust from his office on December 19, 1994. (ECF No. 91-24 at 51.) Cantrell also testified that on December 25, 1994, Rudin, Cantrell, and their other sister went to Ron's office, and after having a locksmith change the lock on Ron's personal office, Rudin took financial paperwork, the death certificate for Ron's former wife, a police report, property deeds, cards, and letters. (Id. at 59–60; ECF No. 66-25 at 28–30.) And following a discussion Rudin had with law enforcement, Cantrell testified Rudin told her she "made a point of going back over to the detective and saying Ron always wears black pants and Ron always wears cowboy black boots, because [she] had caught [herself] talking about him in the past tense." (ECF No. 91-24 at 71.) Cantrell also testified that Rudin itemized Ron's net worth while he was missing and told Cantrell to tell police "she and Ron were getting along better than ever; and that he had just spent $30,000 to open her antique store; and the girlfriend wasn't an issue; that Ron wasn't going to see her anymore." (Id. at 74, 87.)

Augustine Lovato testified he worked for Rudin the week of January 12, 1995, converting her master bedroom into an office. (ECF No. 66-22 at 14, 47–48.) Lovato removed the carpet in the master bedroom and found the carpet around the bed location was hard, "like something had been spilled,"[14] and smelled like his dogs "after they'd been chewing on rabbits." (Id. at 58, 62.) Lovato looked closely at a portrait of Rudin on the wall above the bed in the master bedroom and "saw brownish red splatters going from the bottom right-hand corner to the top." (Id. at 65.)

Lovato testified Rudin had commercial-type carpet installed in the master bedroom prior to his return to the residence on January 14, 1995. (Id. at 74.) Rudin had also replaced the portrait of herself with a picture of three girls. (Id. at 79.) Lovato found the portrait of Rudin hanging in the guest bedroom, but it had been cleaned. (Id. at 80.) Rudin had Lovato load the mattress, box spring, and portable wardrobe from the master bedroom into a moving truck and throw them into a dumpster. (Id. at 87–88.) At one point during the week, Lovato heard a gurgling noise coming from the bathroom, and when he went to investigate, he saw "there was like a brownish reddish blob like stuff backing up out of the bathtub." (Id. at 95.) Rudin gave Lovato a package to mail to Rudin's mother, which Lovato forgot to mail and later turned over to law enforcement, that contained, inter alia, letters, a postcard from Sharon, a photograph of Sharon, and a note to Rudin's mother stating "[p]lease hold on to my ye." (ECF No. 66-26 at 62, 75-77.)

The defense attempted to discredit Lovato's testimony by presenting Richard Scott, the general operations manager at Carpeteria, who testified about the carpet installation in Rudin's home on January 18, 1995, which was later than Lovato testified it took place. (ECF No. 68-23 at 64–65.) The defense strongly implied Lovato desired to work for Rudin after learning about the

---

[14] Cantrell testified that she saw some carpeting that had been removed from Rudin's house and saw a stain the size of a dinner plate and "thought it might have been spaghetti sauce, wine, blood." (ECF No. 91-24 at 95.)

reward posted for information concerning Ron's death, and, as such, made up portions of his testimony to receive the reward. (See, e.g., ECF Nos. 66-23 at 10–11, 23; 68-16 at 71.) Additionally, the defense heavily questioned Lovato about his felony wherein he hit someone with a baseball bat and his lies about those facts during his grand jury testimony. (ECF Nos. 66-22 at 113–15; 66-23 at 21.)

### 9. Ron's Remains Found

Approximately a month after Ron went missing, on January 21, 1995, a skull, bone fragments, and the burnt remains of an antique trunk measuring 20 inches by 36 inches were found at Nelson's Landing, approximately fifty miles south of Las Vegas. (ECF Nos. 85-11 at 168–170, 173, 179; 85-12 at 23–24, 108.) While the bone fragments were heavily charred, the skull, which was located "35 feet below the burned area," was "relatively intact." (ECF No. 85-12 at 21, 175.) Soil samples were taken from Nelson's landing, and some of those samples detected gasoline. (ECF No. 67-3 at 55-56, 59.) The soil samples were compared to the "materials that were recovered from [Ron's] vehicle." (ECF No. 67-19 at 13.) However, those soils samples could not be eliminated or confirmed as the source of the soil found in Ron's vehicle. (Id. at 15.)

Investigators identified the skull as Ron's based on dental records and a distinctive bracelet that read "Ron" found at the scene.[15] (ECF Nos. 85-12 at 26, 188; 65-25 at 103.) An examination of the skull revealed three bullet entrance wounds "on the left parietal occipital area, the side and back of the head" and one bullet entrance wound "that entered the mandible and exited the right side of the head." (ECF No. 85-12 at 177, 197.) Investigators recovered three .22 caliber projectiles from Ron's skull. (Id. at 179.)

---

[15] Ron's ex-wife, Carolyn Rudin, identified the bracelet as the one she purchased for Ron during their marriage. (ECF No. 90-91 at 94.)

John DeHaan, a consulting criminalist on fire issues, testified for the defense. (ECF No. 68-7 at 7.) DeHaan concluded "the evidence was consistent with the trunk and portions of the body set afire [at Nelson's Landing] using a quantity of gasoline, and not with the entire body having been burned at that site." (Id. at 49.) DeHaan's conclusion was based, in part, on his opinion that burning an approximately 200-pound human body to the extent that Ron's remains were burned using gasoline as an accelerant would take four or five hours and require "a gallon of gas every three or four minutes." (Id. at 34.)

Regarding the burned trunk found with Ron's remains, the State presented the testimony of Bruce Honabach, an antiques picker who did business with Rudin. (ECF No. 85-12 at 114, 119.) Honabach testified that Rudin purchased an antique trunk measuring three feet by two-and-a-half feet in the spring or summer of 1994. (Id. at 123, 126.) Honabach was shown a photograph of the charred remains of the trunk found at Nelson's Landing and testified the trunk in the photograph matched the pattern of the trunk he previously sold to Rudin. (Id. at 127.) Honabach testified he obtained the trunk "about three weeks before [he] met Margaret" from "Don Shipeter" in Boulder, Nevada for $75.00.[16] (Id. at 140–41.)

During the State's rebuttal case, the defense received a telephone call from Don Schaupeter, who indicated he was the person who sold Honabach the trunk.[17] (ECF No. 68-25 at 55.) The state district court allowed the defense to "reopen their case in chief" and present

---

[16] Honabach also testified that Rudin told him that "the only reason she was staying with [Ron was] because he was going to die" and that Honabach did not "realize how terrible it really [was] with Ron." (ECF No. 85-12 at 119, 122.) Honabach set up a meeting with Ron and told him "[t]hat [Rudin] kept saying she wishes he was dead and that she wasn't getting enough money; that he wouldn't give her any money and she wanted money." (Id. at 134.)

[17] The defense had tried to locate Shaupeter, but his name had been misspelled by the State. (ECF No. 68-25 at 55.)

1  Schaupeter's testimony to the jury. (ECF No. 69-1 at 9.) Shaupeter testified he never sold

2  Honabach a trunk. (Id. at 16–17.) Rather, Shaupeter sold Honabach "a shoe skate box." (Id. at 20.)

3         The State also presented evidence that Cantrell saw and captured a photograph that showed

4  a trunk at Rudin's store on December 17, 1994, and that during a search of Rudin's antique store,

5  law enforcement found some inventory lists which listed trunks. (ECF Nos. 91-24 at 39; 66-26 at

6  85–86, 89–91.) Contrarily, the defense presented the testimony of Melvin Eikenberry, who

7  testified he helped Rudin move antique furniture into her store in December 1994 and thereafter

8  worked in the store from December 10 or 12, 1994 until February 1, 1995. (ECF No. 68-17 at 109–

9  110, 112.) Eikenberry never saw a trunk in Rudin's store the weekend of her grand opening:

10  December 17 and 18, 1994. (ECF No. 68-18 at 2.) When Eikenberry was shown Cantrell's

11  photograph, he indicated the item shown was not a trunk like the one found with Ron's remains

12  but was instead "a chest, dresser type." (Id. at 3.) And Nakashima testified she visited Rudin at her

13  store on the evening of December 19, 1994, but she saw no trunk. (ECF No. 68-17 at 53.)

14            **10.**    **Rudin's Actions After Ron's Remains Found**

15         When law enforcement told Rudin that Ron's remains were located, she showed no

16  emotion. (ECF No. 66-26 at 45, 50–51.) Rather, "Rudin just stared at [the detective] for a second;

17  and then she put her face down in her hands and covered her face for a minute; and then she started

18  to rub her knuckles in her eye; and when she looked up she wasn't crying." (ECF No. 85-17 at

19  253.) Rudin never asked the detectives how Ron died or the circumstances of his death. (ECF No.

20  68-3 at 122–23.) A search warrant was executed on the Rudin residence on January 27, 1995. (ECF

21  No. 85-17 at 259.) By that time, the portrait of Rudin had been removed from the home. (Id. at

22

23

262.) Indeed, on January 24, 1995, Rudin took the portrait to a Michael's craft store and asked that glass be put on it.[18] (ECF No. 67-3 at 64–66, 71.)

### 11.   The Bedroom

Law enforcement theorized Ron was shot while he was in bed asleep. (ECF No. 66-27 at 84.) The box spring Rudin discarded with Lovato was collected. (ECF No. 67-6 at 13–16.) That box spring was presumptively tested for blood with a positive result. (ECF No. 67-4 at 25, 29, 32.) The portrait of Rudin, which was collected from Michael's, and a white electric cover plate collected from the Rudin bedroom also presumptively tested positive for blood. (Id. at 33, 47, 51.) And during the search of the Rudin residence, reddish spots were observed "on the south wall, the east wall, the west mirrored closet doors and the ceiling." (ECF No. 67-6 at 39–40.) Toby Wolson, a criminalist with the Miami-Dade Police department and independent consultant, testified the blood stains found on the walls were "consistent with . . . a forceful impact into a blood source that was located near the south wall, closer to the east wall than the west wall, along that south wall." (ECF No. 68-25 at 7, 68.)

DNA tests were conducted on the box spring and cover plate and compared to a handkerchief known to have been used by Ron. (ECF No. 67-17 at 25.) The testing of the box spring, cover plate, and handkerchief "were consistent with having originated from the same individual." (Id. at 35.) Analysts were unable to test the DNA found on the portrait, except to say it was human. (Id. at 26–28.) A bed control device found in the bedroom was also tested, and "the blood on the handkerchief [could not] be excluded as the donor of the blood on that device." (ECF No. 67-21 at 3.) Some human, male blood was identified on the grass wallpaper on one of the walls

---

[18] The Michael's employee who processed Rudin's portrait testified that she did not notice anything unusual about the portrait except a scratch. (ECF No. 67-3 at 90–91.)

in the bedroom and on a mirrored doorjamb. (Id. at 5, 9.) And human, male blood consistent with the handkerchief was found on the mirrored door track and ceiling.[19] (Id. at 9, 11–12.)

Luminal testing was completed on the walls of the bedroom to presumptively test for the presence of blood. (ECF No. 67-13 at 9.) On the south wall, luminescence created an oval pattern that "started about 30 inches off the floor, and . . . approximately four feet from the east wall" and "extend[ed] upwards and to the right . . . for about a little over two feet maybe." (Id. at 10.) The luminol also showed "a reaction in the southeast corner of the room on the floor," a circular pattern on the ceiling[20] towards the south wall, a small reaction on the east wall, and "a few other smaller areas on the floor that were up against the south wall." (Id. at 12–13.)

The defense presented three experts regarding the evidence found in the Rudin bedroom: Dr. Nora Rudin,[21] Dr. John Thornton, and Thomas Streed. Dr. Rudin, a forensic DNA consultant, testified she reviewed the police reports, laboratory reports, and trial testimony relating to the evidence found in the Rudin bedroom. (ECF No. 68-8 at 40–41.) Dr. Rudin testified, inter alia, that (1) she could not render an opinion whether the source attribution for the bed control device related back to the sample received from the handkerchief, (2) she could not make a source attribution for the second slump stone on the south wall as relating back to the sample received from the handkerchief, (3) she could not make a source attribution for the slump stone blood

---

[19] Yellow material was also collected from the ceiling, but it was found to be female brain tissue. (ECF No. 67-21 at 13–15.) This was believed to have been from the suicide of one of Ron's ex-wives, Peggy Rudin, in the same room on December 20, 1978. (ECF No. 67-28 at 17.)

[20] Following Peggy Rudin's suicide, it was reported that there was blood-like substances and fleshy tissues substances on the south wall, on the west wall, on the east wall, and on the ceiling. (ECF Nos. 67-13 at 16; 67-14 at 3.) A crime scene analyst testified that it was possible that some of the luminescence found on the ceiling following Ron's murder could have resulted from Peggy Rudin's suicide, but this was not the case with the luminescence on the south wall due to Peggy Rudin's location when she died. (ECF No. 67-13 at 17–19.)

[21] Dr. Rudin had no relation to Ron. (ECF No. 68-8 at 32.)

sample as relating back to the sample received from the handkerchief, (4) she had no information on the mirrored doorjamb, and (5) no blood or human DNA was detected on the portrait. (Id. at 60–62.)

Dr. Thornton, a forensic scientist, testified he reviewed Ron's autopsy report, the photographs and x-rays of the skull, the crime laboratory reports and notes, and the trial testimony relating to the evidence found in the bedroom. (ECF No. 68-19 at 92–93.) Dr. Thornton opined "the bloodstain evidence [did not] indicate[] that Ronald Rudin was shot" in the bedroom. (Id. at 94.) Dr. Thornton explained, inter alia, that (1) "[w]ith a smaller caliber firearm, there is less likelihood of having such a busy or complex extensive distribution of blood;" (2) the total amount of blood found on the bedroom walls and ceiling was "less than a drop of blood from an eye dropper;" (3) he was "skeptic[al] that either of the two stains on the west wall were deposited as a result of the same activity responsible for any of the other blood anywhere within the bedroom"; (4) he believed it was "very risky to view the stain on the east wall as being part and parcel of the constellation of other stains at the scene"; (5) there was no evidence of misting from a gunshot on the south wall; (6) there was no evidence of a cleanup; (7) he would have expected blood on the bottom of the portrait's frame due to its location if Ron had been shot lying in bed; (8) if Ron was shot while lying in bed, the shooter would have had to have bent down to make the lateral mandible shot and then would have had to move Ron's body or run to the other side of the bed and shot Ron in the back of the head three times; (9) he believed that rather than lying in bed, Ron was standing when he was first shot in the face, he crumbled, and then three shots were fired to the back of his head; and (10) he would have expected to see "a lot more blood" with a gunshot and "a more coherent pattern." (ECF No. 68-20 at 2, 23–24, 30–32, 44, 49–50, 53–55, 69, 96.)

Thomas Streed, a crime scene reconstructionist, testified he reviewed the evidence in the case and personally viewed the residence. (ECF No. 69-2 at 33, 39.) Streed also opined "Ron Rudin was not shot in that bedroom." (Id. at 41.) Streed explained, inter alia, that (1) some of the droplets of blood were "determined to be inconclusive in terms of establishing that they were the blood of Ron Rudin;" (2) the amount of blood dispersed on the walls and ceiling was only a drop in total; (3) there would be more blood if "Rudin would have been shot in that room;" (4) the stains were too widely separated to be in any sort of pattern; and (5) it was possible the stains were deposited over a period of time. (Id. at 42–44, 48.)

The defense also presented the testimony of Raesbeck who testified that Ron experienced bloody noses on numerous occasions. (ECF No. 68-23 at 18.) Raesbeck explained Ron usually sneezed multiple times after getting these bloody noses. (Id. at 19–20.) And the housekeeper, Flores, testified that she would always wash Ron's bloody handkerchiefs,[22] which appeared to be from a bloody nose, and would see blood "[i]n the sheets and in the bathroom towels and the . . . pillowcases." (ECF No. 66-11 at 69–70, 74, 93.)

### 12.   The Gun Found

On July 21, 1996, a scuba diver found "a Ruger handgun, .22 caliber" with a silencer in Lake Mead. (ECF No. 67-18 at 4, 13–14, 18, 83.) The gun was located "between 10 and 15 feet" from the shore "in approximately 10 to 15 feet of water." (Id. at 37–38, 87.) The gun was wrapped in numerous layers of grocery bags, each layer secured with "lots and lots of rubber bands." (Id. at 16.) The scuba diver who found the gun testified it appeared the gun was wrapped for preservation purposes. (Id. at 42.) The gun was test fired, and those bullets were compared to the

---

[22] Ron's ex-wife, Karen Carmany Gibbs, testified that when Ron would cut himself shaving, "[h]e would dab that spot with a handkerchief." (ECF No. 67-26 at 69–71.)

bullets recovered from Ron's autopsy. (ECF No. 67-19 at 35–37.) That comparison demonstrated a positive match between the bullets from Ron's autopsy and the gun found in Lake Mead. (Id. at 36.)

Jerrian Munerlyn, Ron's secretary and manager of his realty officer from 1988 to 1993, testified Ron drafted a letter to the Department of Alcohol, Tobacco, and Firearms in October 1988, stating he was missing a .22 semi-automatic gun with suppressor. (ECF No. 65-25 at 70–71, 82–83, 87, 112.) In that letter, Ron explained he "ha[d] a suspicion that the gun was packed away or taken by person or persons unknown during [Rudin's] packing her furniture and personal belongings for storage at that or about that time due to a separation and pending divorce proceedings." (Id. at 88.) It was implied the gun used to kill Ron was the same gun Ron reported missing because the gun used to kill Ron was registered to him and the gun reported missing was not "among the firearms that [an ATF agent] inventoried or saw" in Ron's collection in February 1995.[23] (ECF Nos. 67-18 at 97; 67-19 at 2, 82, 91.)

### 13.    Sharon's Actions

The State granted Sharon immunity and presented him as a witness based on its theory that Sharon assisted Rudin in disposing of Ron's body.[24] Sharon testified he rented a Chevrolet Cavalier around 9:00 p.m. on December 18, 1994. (ECF No. 67-22 at 12–13, 15–16.) He said he rented the Cavalier because he planned to go to Arizona the following day to buy cases of bottles for his business selling holy oils and wanted an automatic vehicle because he "had surgery on his

---

[23] There was some confusion about serial numbers of the gun. (See ECF Nos. 65-25 at 87; 67-18 at 97; 69-5 at 100–101.)

[24] Sharon received immunity from the State for his testimony, but he testified that he had "no idea" why he needed or received immunity. (ECF No. 67-22 at 49.)

right ankle." (Id. at 18.) However, Sharon learned the next day that the bottles had not arrived. (Id. at 21.) Learning this, Sharon traded the Cavalier in for a Chevrolet Astro van on December 19, 1994, so he could buy a pallet of bottles in California instead. (Id. at 23–25.)

Sharon left for Los Angeles on Thursday, December 22, 1994, at 1:00 a.m. (Id. at 31.) Sharon stopped for coffee and gas at approximately 4:30 a.m. around "the end of Barstow or beginning of Victorville" and learned it was raining at his destination in California, so, fearing worse weather on his return trip, he returned to Las Vegas. (Id. at 33–35.) Sharon presented a receipt from a gas station—the "Lenwood AM/PM" located at 2596 Commerce Parkway in Barstow, California—confirming his story, but the State implied the receipt was altered. (Id. at 35–46.) Sharon returned the van on December 23, 1994. (Id. at 30.)

Sharon denied going to Nelson's Landing or killing or helping dispose of Ron. (ECF No. 67-24 at 60.) Sharon also denied romantic involvement with Rudin, explaining they had a business relationship whereby he was "put[ting] her business on computers" and he had a girlfriend at the time. (Id. at 61–62; ECF No. 67-25 at 31, 37.) Following Ron's disappearance, Sharon attempted to assist Rudin in determining her community property interest, conducting research on deeds and documents, and going "through financial statements, the operation of the real estate business, including income taxes, real estate transactions, directive, [and] the trust." (ECF No. 67-25 at 59; ECF No. 67-26 at 6, 10–11.) Sharon also drove Rudin to the Los Angeles airport on January 27, 1995, so she could fly to Illinois to attend Ron's funeral. (ECF No. 67-22 at 73–75.)

A manager at the U.S. Rent-A-Car located near the McCarran Airport in Las Vegas, where Sharon rented the Cavalier and Astro van, testified Sharon drove the van 348 miles.[25] (ECF No.

---

[25] The manager also testified that the trunk of the van, after the backseat was removed, could fit a "a trunk that would be approximately three feet wide, perhaps two or three feet deep and perhaps three feet tall." (ECF No. 68-16 at 41.)

68-16 at 19, 21–22, 37.) A detective testified he drove from Las Vegas—zeroing his odometer near "Interstate 15 and Tropicana"—to Barstow, California, and the mileage was 151.8 miles. (ECF No. 68-3 at 28.) The detective "continued from there an additional . . . 27.6 miles to the Palmdale Road exit in Victorville," so the total mileage one-way was "151.8, plus 27.6." (Id.) The detective testified the mileage on the van was inconsistent with the trip Sharon testified he made.[26] (Id. at 29.) However, according to the detective, the van mileage was consistent with a roundtrip to Nelson Landing from Las Vegas. (Id.)

### 14.    The Civil Suit

Rudin "made a claim against the trust for her share of the trust as a beneficiary." (ECF No. 65-26 at 14.) That civil litigation pertained to whether Rudin "was entitled to receive funds and to make a determination for community issues." (ECF No. 67-31 at 15.) At the conclusion of that litigation in 1996, Rudin received no monies from the trust as a beneficiary and received no monies from the community property she held with Ron; rather, Rudin settled for $517,000 two weeks into the civil trial. (Id. at 15–17.) Cooper received $700,000 as a beneficiary. (ECF No. 85-17 at 7.) And Boscutti received between $1,250,000 and $1,500,000. (ECF No. 66-2 at 6.)[27]

### 15.    Rudin Flees

Rudin was indicted for Ron's murder on April 17, 1997 and fled. (See ECF No. 91-2.) In late August 1998, Rudin, who was using the name Annette Boatwright and working at the San Carlos Hotel in Phoenix, Arizona, was approached by local law enforcement. (ECF No. 67-29 at 71, 73, 79, 92.) An acquaintance in Phoenix recognized Rudin from watching "America's Most

---

[26] This testimony appears to relate to Sharon having driven all the way to Victorville, California, before turning around—not having turned around in Barstow, California.

[27] The Lee Canyon property was sold for $4,800,000. (ECF No. 66-1 at 97.)

Wanted" and notified authorities. (Id. at 118.) Law enforcement failed to arrest Rudin, and she again fled. (ECF No. 67-30 at 7.)

In November 1999, Rudin was apprehended in Revere, Massachusetts. (ECF No. 85-17 at 211–212, 215.) Law enforcement found Rudin with various fake identifications. (Id. at 225.) Following her apprehension., Rudin said "she didn't have any money" because all the money she received in the settlement of the civil suit was spent on lawyers' fees. (Id. at 227–28.) Rudin said "she fled the state of Nevada" upon finding out about the indictment. (Id. at 228.)

### B.   Representation by Trial Counsel

#### 1.   Initial Representation and Retention of Michael Amador

The case came on for an arraignment on March 22, 2000. (ECF No. 56-1 at 20.) Rudin's counsel advised he "represented [Rudin] in the preliminary hearing stage but requested to withdraw as counsel." (Id.) After the state district court granted the request, Rudin "advised she did not have the funds with which to retain private counsel." (Id.) The public defender secured a continuance to interview Rudin to determine her eligibility for appointed representation and to review the paperwork associated with the case. (Id.) The public defender was formally confirmed as counsel on March 31, 2000, and trial was set for approximately six months later on October 30, 2000. (Id. at 21.)

Rudin was not satisfied with the public defender's representation, and a deputy public defender acknowledged during a sealed *in camera ex parte* proceeding on July 7, 2000, that counsel's time to work on the case had been limited. (ECF No. 57-17 at 19.) Rudin retained private counsel, and Michael J. Amador entered a notice of substitution of counsel on July 24, 2000. (ECF Nos. 56-22 at 3–4; 58-1.) The state district court moved the trial out three months to January 29, 2001. (ECF No. 58-7 at 9.)

## 2.    Defense Fee Agreement and Media Rights

Amador's first public action as Rudin's counsel concerned protecting, <u>inter alia</u>, the availability and economic value of her media rights. (ECF No. 56-22 at 5.) A mail-order minister previously met Rudin at the jail and allegedly secured an assignment of Rudin's media rights for a dollar. (<u>Id.</u> at 8, 13; ECF No. 58-2 at 40–43.) Amador's first request for relief in the criminal action was for a gag order prohibiting the minister from revealing any confidences obtained from Rudin, and he further initiated a civil proceeding seeking to invalidate the assignment of Rudin's media rights. (ECF Nos. 58-2; 56-22 at 7; 58-7 at 5; 69-18 at 20–22.)

Amador called his representation of Rudin a "pro bono" arrangement, although they had a retainer agreement whereby Rudin would reimburse Amador for the anticipated value of his services—at least $200,000—if she obtained any funds.[28] (ECF Nos. 69-18 at 22; 91-40; <u>see also</u> ECF No. 70-12 at 35–36.) Throughout the criminal proceeding, Amador repeatedly denied having entered into any other agreements regarding the Rudin case, for example media rights agreements, and denied he was working on a book or any other media projects[29] (<u>See e.g.</u>, ECF Nos. 56-22 at 10; 69-18 at 21, 24.) Rudin, however, explained that Amador "never took [her] case pro bono as [she] signed two contracts with [him] where [he] plan[ned] to explore media rights" after voiding the media rights of the minister. (ECF No. 69-18 at 9, 13.)

Anita Jackson, a staff assistant to Amador from November 2000 until she resigned after the trial in May 2001, attested in a post-trial affidavit, <u>inter alia</u>, that: (1) Amador lied to the court

---

[28] The state district court reviewed this fee agreement and was "satisfied that the fee agreement [was] not improper [and did not] create a conflict." (ECF No. 62-2 at 9.)

[29] The record reflects that at the time Supreme Court Rule 158 provided in pertinent part: "Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation." (<u>See e.g.</u>, ECF No. 70-12 at 6–7.) This provision now is carried forward verbatim in Rule 1.8(d) of the Nevada Rules of Professional Conduct.

because he had book and movie contracts regarding the Rudin case; (2) Amador put the contracts "in his little safe in the back closet" and indicated he did not want anyone to find them; and (3) Amador was affiliated with WeaselSearch.com, a website that covered the entire trial. (ECF No. 70-8 at 73, 75, 77; see also ECF No. 70-12 at 33.) Jackson elaborated during an unsworn on-record colloquy, inter alia, that: (1) she personally saw the media contracts when she organized the Rudin case paperwork early on in her employment; (2) one contract was between Rudin and C&M Productions, giving movie rights to Charlie Ersetti and Maurice Rind, who were friends and partners of Amador; (3) another contract gave Rudin's book rights to Lisa Novack, Amador's wife; (4) another contract "was Michael [Amador] and Lisa [Novack] and it was an overall media release," giving them control over Rudin's media and interviews; (5) with the media agreements in place, Amador planned to write a book and sell it with the rights he had acquired, and Ersetti and Rind were to make a movie; (6) Amador worked on the book throughout the trial and brought portions of the draft to Jackson; (7) Amador, Ersetti, and Rind formed WeaselSearch.com; and (8) Amador's entire interest in the Rudin case was in his receipt of media royalties and publicity.[30] (ECF No. 70-12 at 17–25, 29–30, 32.)[31]

### 3.   Pre-Trial Proceedings

On August 11, 2000, approximately three weeks after Amador became trial counsel, the State noticed 153 potential trial witnesses. (ECF Nos. 58-8, 58-9.) On September 25, 2000,

---

[30] At a hearing held on May 9, 2001, several days after the verdict was reached, Amador said, "I don't care what they write about me or what they think about me, I don't care what they think about my career. All it does is increase the number of calls I get." (ECF No. 69-18 at 22.)

[31] The state district court expressly did not have Jackson sworn before the on-record colloquy. (ECF No. 70-12 at 15.) Notably, there never was a hearing—either on a motion for new trial or on post-conviction review—in which live testimony was received in Rudin's case addressing factual issues as to whether Amador had directly or indirectly entered into media agreements and was working on media projects.

approximately two months after Amador became trial counsel, he filed a motion for public payment of defense investigation and expert witness costs. (ECF No. 58-11.) The motion and/or supporting affidavit asserted, inter alia, that: (1) Rudin was indigent; (2) 58 witnesses had been presented to two grand juries; (3) at least twice that number were expected to testify at trial; (4) the two grand juries and a five-day civil case had produced three voluminous transcripts; (5) there were 10 banker's boxes of business and other records; (6) the State would rely on extensive expert testimony; (7) the defense would "require extensive additional investigation and the retention of expert witnesses . . . to protect her rights to due process and a fair trial"; and (8) "[w]ithout expert witnesses in response the defense would be wholly ineffective." (Id. at 5–7.)

The State opposed the motion because Rudin had not satisfied the requirements for public payment of defense costs in a case with retained private counsel. (ECF No. 58-12.) This led to one of the early inquiries into the nature of the defense fee agreement and related issues, as discussed above. After reviewing the fee agreement in camera as well as apparently receiving Amador's assurances regarding media rights, the trial court granted the defense motion for payment of defense expert and investigation costs on December 15, 2000. (ECF No. 62-2 at 9–10.)

In the interim, Amador, inter alia: (1) filed a variety of defense motions, mainly in October 2000, all but a few of which were generic or stock motions that were potentially applicable protective motions that otherwise did not require significant new writing specific to the case; and (2) secured the issuance of subpoenas seeking information regarding the trust and Rudin's business dealings. (See ECF Nos. 58-14, 58-15, 58-16, 58-17, 58-18, 58-19, 58-20, 59-1, 59-2, 59-3, 59-4, 59-5, 59-6, 59-7, 59-8, 59-9, 59-10, 59-11, 59-12, 59-13, 59-14, 61-12, 61-13, 61-14, 61-15, 61-16, 61-19.)

According to Jackson, who, as previously noted, started working for Amador in early November 2000, she was told when she started working that the defense had just received the files from the public defender and the discovery from the prosecution. (ECF No. 70-8 at 73.) She later learned Amador had been in the case since July and had then received files with discovery from the public defender. (Id.) Jackson attested in her affidavit, inter alia, that Amador and Novack left on a European vacation in November 2000 "for a full month," that "[n]othing relative to the defense of Margaret Rudin's case was done, at any time, during the month of November 2000," and she was "given no instruction whatsoever regarding Margaret Rudin's file" before they left for Europe. (Id.) She asserted in the unsworn colloquy that Amador and Novack "left right when [she]came onboard . . . the second week in November," "were gone for a month," "and then came back the second week in December or first week in December."[32] (ECF No. 70-12 at 32.)

According to Jackson, in December 2000, she observed Amador working on other cases, planning a Christmas party, and meeting friends; but she did not observe him prepare for Rudin's trial.[33] (ECF No. 70-8 at 73.) She attested the Rudin file "was just sitting there" without any instructions to her about the file, she initiated organizing the file, and in the second or third week of December, Amador finally explained how he wanted her to organize the file binders.[34] (Id.)

---

[32] In contrast to Jackson's assertion of "a full month" vacation, Amador attested in a later affidavit that he took a preplanned and "well-deserved" two-week European vacation that included the Thanksgiving holiday. (ECF No. 71-2 at 4.)

[33] The state court record reflects that Amador was engaged in some motion practice in the Rudin case in December 2000, including defending against State motions. (See ECF Nos. 61-11 through 62-13.) Jackson acknowledges that filings were occurring, but she maintains that staff were forced to prepare and file motions at the last minute on one hour's notice. (ECF No. 70-8 at 74.)

[34] Contrary to Jackson's assertions, Amador attested his "office began an extensive, methodical, and thorough review of the discovery documents, witness statements, and transcripts" after he was confirmed as counsel. (ECF No. 71-2 at 4.)

Amador filed a motion to continue the trial date for at least a month after the scheduled January 29, 2001, trial date. (ECF No. 62-1.) Amador attested in support of the motion that, following a recent hearing on discovery motions, he met with the prosecutors on December 8, 2000. (Id. at 3.) He attested "it was discovered that extensive discovery was missing from the defense file" and the State "provided copies of interviews with witnesses and extensive tapes from wiretaps." (Id.) The state district court continued the trial date initially to March 5, 2001, but four days later, on December 19, 2000, the state district court "firm[ed] up the exact trial date" as February 26, 2001. (ECF Nos. 62-3 at 69; 62-8 at 102.)

According to Jackson, Amador's "main focus, from what [she] could see," during January 2001, was his relationship issues with Novack and not Rudin's trial. (ECF No. 70-8 at 74.) Jackson attested Amador fired Novack, his office manager, and her mother, Candy Novack, his secretary, during the last week of January. (Id.) This reduced Amador's office staff to just one person, Jackson, who became responsible one month before the murder trial for all office functions. (Id.) As noted, the state court record reflects that Amador was engaged at the very least in some motion practice in the Rudin case during January 2001, including litigating a defense motion to disqualify the district attorney's office from prosecuting the case. (See ECF Nos. 62-20, 62-21, 62-22, 63-5, 63-11.)

On February 1, 2001, the State filed witness lists containing 53 fact witnesses and 21 expert witnesses. (ECF Nos. 85-23, 85-24.) On February 7, 2001, Amador noticed 7 defense expert witnesses. (ECF No. 85-7.) In contrast to the State's expert witness list, the record shows Amador failed to attach curriculum vitaes to the expert notice. (See id.)

Also on February 7, 2001, Amador filed a motion to continue the trial date or, in the alternative, appoint experienced criminal practitioner Thomas Pitaro as associate counsel at public

expense. (ECF No. 85-8 at 9.) The motion papers asserted, only 19 days before trial, inter alia, that: (1) the State revealed the existence of seven additional boxes of materials over the New Year's holiday, other discovery was not provided to defense counsel until February 1, 2001, and an appointment for defense counsel to review the seven boxes of new material was rescheduled to February 7, 2001; (2) the State submitted a list of 21 experts; (3) the defense previously retained Tom Streed as a crime scene analyst and blood spatter expert; (4) Streed "had agreed to assist counsel by obtaining the necessary expert witnesses after reviewing the discovery and photographs;" (5) defense counsel needed additional assistance "due to the complexity of the case, [and] the receipt of additional new discovery in open court on 2/01/01." The motion further asserted:

> "[The new materials, including the seven additional boxes] will require further review and investigation at a time when the defense is preparing for trial and has no additional time to review these materials, conduct pretrials, draft additional motions if applicable to the contents of these boxes, respond to the State's experts testing of materials therein, interview and retain defense experts and prepare for the State's list of witnesses some of whom are new and have not been investigated and continue to locate and interview prospective defense witnesses, who have moved, relocated or who are uncooperative or who feel threatened or intimidated by the prosecution team or homicide detectives."

(Id. at 5-6.) The supporting affidavit additionally stated, as to witnesses, that "most have never been contacted by defense investigators." (Id. at 5.)

At a February 12, 2001, court hearing on the motion, Amador represented to the court that he needed Pitaro "to help with all of the experts and [that] he [would] be submitting additional affidavits with respect to investigation." (ECF No. 85-1 at 28.) Amador further stated that Michael Wysocki would serve as the defense investigator from that point forward. (Id.) The state district court appointed Pitaro as additional counsel. (Id.; see also ECF No. 64-10 at 5–6.)

Pitaro later attested Amador assured him and kept assuring him he was prepared for trial and had the case under control. (ECF No. 70-8 at 69.) However, Pitaro's initial impression, based on Amador's assurances, that the case was ready for trial quickly changed. (Id. at 68.) Pitaro became increasingly concerned as he learned the true state of the defense preparation that the case was not ready for trial. (Id. at 68–69.) With regard to the most basic aspects of trial preparation, Pitaro attested, inter alia, that Amador initially told him the files were in good working order, were all in binders and folders maintained by Jackson, and were to be kept in a designated area of his office so they were accessible. However, when Pitaro initially tried to review the files, "there was always so much confusion going on that it was difficult to do so;" and once he was able to do so, he found that although files and discovery[35] were copied and placed in binders and files, it appeared no work was done with the materials. In particular, there were no notes, underlining or highlighting of relevant portions of the files and transcripts reflecting that trial preparation work had been done with the materials. Pages in some of the binders were in reverse order or jumbled and could not be read in that condition. And, when Pitaro asked to review the photographs in the case, he was told an expert had the complete set and was not returning Amador's calls, prompting Pitaro to insist on return of the photographs immediately so that the defense had a complete set. Pitaro further attested that no exhibit list was prepared and that "many actual and potential witnesses had not been adequately interviewed, if at all."[36] Finally, Pitaro attested that Amador

---

[35] Pitaro testified at the post-conviction evidentiary hearing that "there was probably thousands of pages of discovery." (ECF No. 74-8 at 8.)

[36] Contrarily, Amador attested that "[a]ll major witnesses had been investigated, organized and completed prior to [his] vacation in Europe over Thanksgiving 2000." (ECF No. 71-2 at 5.)

1  stated he hired an investigator "but that he had not done a good job," so investigators Tom Dillard

2  and Michael Wysocki[37] were hired in February 2001 and "had to start from scratch." (Id.)

3      Regarding expert witnesses, Amador initially told Pitaro the only area where he needed

4  Pitaro's assistance was with "some of the expert witnesses." (ECF No. 70-8 at 67–68.) According

5  to Pitaro, "it took some time before [Pitaro] could pin [Amador] down as to exactly which

6  witnesses he wanted [Pitaro] to be responsible for." (Id. at 68.) Pitaro quickly learned that "helping

7  with the experts" actually "meant attempting to find experts to testify as experts had not been

8  hired." (Id.) Pitaro attested that Amador told him he relied on Streed to get the experts for him, but

9  Streed had not done so. (Id.) According to Pitaro, Amador repeatedly said he hired pathologist Dr.

10  Thomas Nogouchi. (Id.) However, it was Pitaro's belief that Dr. Nogouchi was merely contacted

11  and conducted no work on the case. (Id.) Pitaro—less than two weeks prior to a murder trial—was

12  thrust into the role of contacting experts he utilized in the past and who he thought might aid

13  Rudin's defense.[38] (Id.)

14      Dillard corroborated Pitaro's account as to the lack of readiness of the Rudin defense two

15  weeks prior to the murder trial. (See ECF No. 70-8 at 80–83.)  Dillard attested, inter alia, that: (1)

16  he began work on the case the second week of February 2001; (2) he realized many files were

17

18  ───────────────

[37] Pitaro attested that Amador had "agreed to pay Dillard and Wysocki out of his own pocket," but

19  "[g]iven the work that needed to be done and the incredible time both men were putting into the case," Pitaro "sought court appointed status for them, and Mr. Amador agreed to pay any part of

20  their fees that was not paid by the court." (ECF No. 70-8 at 69.)

Dillard attested that Amador originally told him he was authorized by the state district court as a

21  court-appointed investigator and, as such, would be paid by the court. (ECF No. 70-8 at 81.) Dillard was later notified by Pitaro that this was untrue, and after Dillard, Wysocki, and Pitaro confronted

22  Amador, Amador agreed to pay Dillard and Wysocki at the court appointed rate. (Id.)

23  [38] Contrarily, Amador attested that "[w]ith the limited exception of the DNA experts, every other forensic and scientific issue raised in the Rudin case was documented and researched prior to Mr. Pitaro's involvement in the case." (ECF No. 71-2 at 5.)

incomplete and Amador failed to interview any of the proposed State witnesses; (3) no witnesses were subpoenaed for the defense, so he and Wysocki subpoenaed the most crucial witnesses; (4) it was his recollection Amador previously contacted only one expert witness, Streed; (5) accordingly, "little preparation for trial had been completed by Mr. Amador or his office;" and (6) based upon Dillard's investigation of approximately 200 homicide cases and participation in approximately 100 murder prosecutions as a police officer and his participation in approximately 35 defense murder investigations and nearly as many trials for the defense in murder cases, "[i]t was clear to [him] under no uncertain terms that the case was not prepared to go to trial at that point." (Id.)[39]

Jackson attested that approximately a month before trial, the court approved Rudin's transport to Amador's office once a week for trial preparation. (ECF No. 70-8 at 75.) According to Jackson, Amador used Rudin's presence at his office for media attention and exposure rather than trial preparation. (Id. at 75–76.) Amador used the first visit for a get-together with John Connelly, a writer associated with the National Enquirer, and Pitaro. (Id. at 75.)[40] The second and third visits were taken up with the television documentary show 48 Hours,[41] along with someone

---

[39] The assertions by Pitaro and Dillard are also corroborated in part by the contemporaneous state court minutes, which demonstrate that as of a February 15, 2001, motions argument, the State was not provided any defense expert curriculum vitae or reports and Amador planned to file an amended notice to add experts "that were left out" of the initial defense expert notice. (ECF No. 85-1 at 31–32.) On February 20, 2001, only 6 days before trial, Amador filed an amended notice of expert witnesses in open court adding five more experts. (Id. at 32; ECF No. 64-9.)

[40] Jackson further attested that in December 2000 the National Enquirer published a damaging article on Rudin written by Connelly. (ECF No. 70-8 at 75.) Jackson learned that Amador had cooperated with Connelly on the article and had provided him information and Rudin's private family photographs for the article. (ECF No. 70-12 at 19.) Jackson asserted that when she queried why Amador had assisted with the damaging article, he responded that it "was to increase media attention and public interest in the case." (Id. at 24.)

[41] Jackson attested that "[w]hen the national television magazine program, 48 Hours, got involved in the case, Mr. Amador's . . . major concern was . . . being on camera." (ECF No. 70-8 at 75.)

brought in the third week to dye and cut Rudin's hair and prepare her makeup. (Id. at 76.) When

Rudin complained to Amador during the second week about the need to work on her case, he

assured her they would get to her case the next week, which did not happen. (Id.)[42] Jackson did

not recall any work being done on Rudin's case during the approximately 20 hours total that Rudin

was at Amador's office. (Id.)

Pitaro, Dillard and Jackson each attested that—as the trial began on February 26, 2001—

the Rudin case files and binders suddenly disappeared without warning. (ECF No. 70-8 at 69, 75,

82–83.) They discovered that Amador moved all the case materials to a room in the Four Queens

Hotel and Casino in downtown Las Vegas, where he stayed during the trial. (Id.) This made it very

difficult for Pitaro, Dillard, and Wysocki to access the files for trial preparation work, as they had

access only when Amador was both available and in the room. (Id. at 69, 83.) During trial, files of

testifying witnesses were forgotten, misplaced or not brought to court. (Id. at 69.) About mid-trial,

Pitaro finally prevailed upon Amador to allow him to move the bulk of the case materials to

Pitaro's downtown office so that he, Dillard, and Wysocki could access them. (Id. at 69, 83.)

### 4.   **Voir Dire**

Jury selection commenced on Monday, February 26, 2001. (ECF Nos. 65-10, 65-11, 65-

12, 65-14, 65-15.) Pitaro participated in the first day of voir dire along with Amador so the jurors

would be familiar with him, and thereafter he returned to trial preparation. (ECF Nos. 74-8 at 8;

70-8 at 69.)

During voir dire, the state district court repeatedly either sustained objections to or sua

sponte cut off Amador's questions to individual venire members, admonishing Amador at times

---

[42] The state court record corroborates Jackson's account that Amador was making Rudin available
to 48 Hours less than two weeks before the murder trial. (See ECF Nos. 64-3, 64-4.)

regarding, inter alia, his use of individual voir dire to argue the case. (ECF Nos. 65-10 at 43, 71, 88, 89, 91, 122; 65-11 at 6, 62; 65-12 at 31, 66; 65-14 at 27, 46–47, 49–50, 64, 69–70, 84, 121; 65-15 at 7, 47.) At one point on the second day of voir dire, the state district court told Amador to "[f]inish up, . . . . We're getting too long. I've been really holding my patience, but too many questions here." (ECF No. 65-14 at 50.) And a little while later, the state district court scolded Amador:

> I'm getting - - I'm starting to lose my patience, Mr. Amador. . . I've had a lot of trials and it's just not the way it goes. You're going into things that doesn't go to the qualification - - it seems to me you're preaching, you're teaching, which I'm not saying is wrong in certain aspects, but we are not on a pulpit. . . . We are trying to pick a fair and impartial juror. We aren't trying to preach to them or - - it's just going a little too far as far as this Court's concerned.

(Id. at 84–85.)

Early during the second day of voir dire, a prospective juror stated during his individual voir dire that other venire members had snickered about Amador "maybe saying that he wasn't like efficient." (Id. at 52–53.) The potential juror was excused, without delving deeper into the venire crosstalk. (Id. at 53.)

### 5.   Opening Statements

Jury selection concluded on Tuesday, February 27, 2001, and the state district court scheduled opening statements for Friday, March 2, 2001, to give all concerned time to prepare their affairs for the anticipated long trial. (ECF No. 65-15 at 85–86, 132–34.) Jackson attested that Amador prepared his opening statement the night before his delivery of it. (ECF No. 70-8 at 76.)

The State gave a nearly two-and-a-half hour long opening statement, methodically laying out the evidence it would present. (ECF No. 85-11 at 5, 8–91.) The state district court then recessed

for lunch. (Id. at 91.) Jackson attested Amador rewrote the defense opening statement during the lunch break. (ECF No. 70-8 at 76.)

Amador's opening statement in the first-degree murder trial began with the following:

> This is a great day, in a lot of different ways. Some days are difficult; some days we hear bad news or we go through a difficult time, but every day, every day, depending on how you look at it, with a few exceptions, can be a celebration.
>
> And I don't mean that lightly.
>
> There are things about our lives today and the place where we live that are like no other places and no other time in history.
>
> So if I, at times in questioning, become a little dramatic or I discuss or question jurors (sic) about things that might be important to me or to you, and as I go through the things I anticipate this trial will bring to you and to us, I state it's a great day for each of you because you have an opportunity to experience what we do here.
>
> The courtroom is filled with all sorts of different people. The eyes of the world are upon us and our fine city where we live and make our home.
>
> We are not perfect. We can always do better. But sometimes, what we [sic] do in my own life is review things I've done, see if I can do better, because I'm not perfect and sometimes I forget the rules.
>
> That's okay, because there will be objections during the course of the trial; the judge will make decisions on some of those rules, and we might fight over some of those rules, but that's just little stuff. We'll get past that.
>
> But today, we begin. We will bury Ron Rudin in this trial.  We'll put to rest a lot of questions and we'll come to understand the truth.

(ECF No. 85-11 at 92–93.)

Amador followed this introduction with a discussion of himself, intermixed with scant discussion of the case, explaining, inter alia, the following:

> This is a great day for me. This is a culmination of a career.  The people in this case, we are not strangers; we know each other.  Chris and I were sworn in as deputy DAs the same day. And I congratulate Chris on a presentation

that was organized and well thought out, the best money can buy. It really was good.

Perhaps I'm a little different sometimes than other people might be. I look for passion in people. I look for not merely those who wish to exist, but people who want to celebrate life.

. . . .

If you want to know an opinion about me, I guarantee you'll find some, different ones from different people. Not many people know me. I have few close friends, like Ronald Rudin had few close friends.

. . . .

You see, when you judge someone, you can't judge them on what they do today. We have good days; we have bad days, things that affect each of us in our every day lives.

I could be a wonderful, caring father, coaching soccer, helping kids with their homework, which I did the first time I got married when they were young.

Then another day, I might scream at someone, yell at them for – I don't know – for asking me some question, because I was too busy and I was thinking of something else.

. . . .

I don't make myself perfectly clear. Tom Pitaro is my co-counsel on this and I'm greatful [sic] to have him here.

Sometimes in my zeal, I need to be grounded a bit from someone as good as Tom, as good a friend as he is.

Investigators like Mike Wysocki and Tom Dillard, you see, the two homicide detectives in this case; Detective Jimmy Vaccarro, most of us know him, although I'll refer to him as Detective Vaccarro on the witness stand. That's how we treat each other with respect.

I've known Jimmy since 1980 when I got here, when I was a green 25 year old [sic] kid, when I came here to crush crime and make the world safe for democracy.

Tom Dillard was a – he's a retired homicide detective; one of the best there was. Mike worked in the '70s, undercover Metro narcotics.

Detective Ramos worked various times on the street, Metro narcotics, undercover a long time, and homicide.

. . . .

Some rules that are helpful, just a couple of them: To be honest, this portion probably was about eight pages the first time I wrote it and it was thoroughly confusing to anybody but me.

See one of the difficulties I have sometimes is not in analyzing facts, not in looking at something and knowing what it means, using my own meager efforts to figure something out.

The difficulty I have at times is communicating to people. I have to look at it and talk to other people and they will bring me back down to earth and say: Mike, what are you trying to say? What are you trying to get across?

. . . .

I reviewed again this morning my opening statement and threw most of it away.  I don't know, maybe it's just something I do.

One day, I may seem to be aggressive and argumentative when we want to fight over every issue. You may remember. And other times, you kind of stand back and you look to see what's important for each of you to see.

(Id. at 96, 98, 100, 101–02, 103, 104.)

The state district court finally interrupted Amador:

THE COURT: All right. Mr. Amador, I think I'm ornery all the time.

This is really an opening statement, and I don't know if the DAs want to object; they've been very polite, I think.

I allowed Mr. Owens to, you know, get away with the Margaret play and Shakespeare quote. That's fine.

But – we've been here 35 minutes. You can maybe save that for closing.

But an opening statement is just like a roadmap to try to show what the evidence will show; and you're really, for 35 minutes now – I didn't mind five, 10, 15 minutes, but I would wish, in all respect, that you would just get to what the evidence, in your opinion, will tend to show and move on.

37

1

2          All right?

           I hate to interrupt you. I'm obligated, as a judge, to do that.

3          But proceed please.

4

5   (Id. at 104–05.)

6          The State thereafter objected somewhat more freely, with Amador acknowledging he was

7   arguing the case or noting he did so without objection. (See id. at 118, 120, 122.)

8          Approximately an hour-and-a-half into his opening, Amador attempted to refer to an

9   alleged statement by a deceased person pertaining to an alleged missing persons report or inquiry

10  by Rudin. (Id. at 126.) The State objected on the grounds that there was no good faith basis for the

11  assertion and the alleged statement was hearsay and had not been raised in a pretrial motion. (Id.

12  at 126–28.) The state district court retired the jury for on-record argument, in the middle of the

13  defense opening. (Id. at 127.) The state district court again admonished Amador regarding the

14  content of his opening statement:

15         THE COURT:  Again, I keep saying this – and I let you get away with a lot, Mr.
           Amador – but the purpose for an opening statement is just to indicate what the
16         evidence is going to tend to show and not go into your personal beliefs and your
           passion and soccer dad and yelling at the staff and whether you were a green lawyer
17         and know all the cops and used to be a D.A. and you communicate differently. I
           never heard that in opening statement in my life.

18

19  (Id. at 129.) Amador could not substantiate the existence and admissibility of the prior statement,

20  and the state district court directed he not repeat the reference in his opening. (Id. at 129–30.)

21         Immediately after the jury returned, Amador stated, "During the course of the trial, there

22  may be objections and things like that. Don't worry about it. We just have to do some other things."

23  (Id. at 131.) The state district court interrupted Amador, "I don't know what that means: Don't

38

worry about objections. We have to do other things. I have no idea what that means. If there's an objection, I'm either going to overrule it or sustain it and that's the law." (Id.) Amador conceded he "didn't speak very well." (Id.) Thereafter, Amador's defense opening generated further multiple objections from the State. (Id. at 145, 147, 151, 155, 161–64.)

At approaching three hours into the closing, the state district court directed Amador to "[f]inish up." (Id. at 161.) When the State again objected that Amador was arguing the case, the state district court stated: "I know. You should have saved an hour and-a-half, two hours for closing. This is a quasi combination of opening and closing, whatever. I let you get away, Mr. Amador, but I'm losing patience. Summarize it. The objection is sustained.  You're not to say that." (Id. at 164.) Amador brought the opening to a close a short time thereafter. (Id. at 165.)

Pitaro attested Amador's opening statement "presented no cohesive theory . . . except that Ron Rudin committed real estate fraud." (ECF No. 70-8 at 70; see also ECF No. 74-8 at 8.)[43]

---

[43] This Court previously noted that Rudin made references to a video of Amador's opening statement but cautioned that no exhibit was in the federal record. (ECF No. 81 at 4.) This court directed Rudin, "if she wishe[d] for the Court to consider any video exhibits not then on file," to "file a motion for the admission of the video exhibits . . . along with presentation of the proposed exhibits as manually-filed exhibits submitted with the motion." (Id. at 6.) Rather than moving for admission of and manually filing an exhibit of the opening statement video as instructed, Rudin "offer[ed] Exhibit A," explaining that "a flash drive [was] sent via overnight delivery." (ECF No. 86-1.) Because Rudin failed to file the appropriate document—a motion—there was no briefing on the issue of whether the video should be admitted and considered. (See ECF No. 81 at 4 n.3.) Further, the video was merely sent to this Court without a notice of manual filing—the appropriate procedure for sending physical exhibits to this court. See LR IC 1-1(d). Therefore, this Court has not considered the video of Amador's opening statement because Rudin failed to follow this Court's instructions and this court made it clear that it "was not inclined to delay a final resolution of this matter for an extended collateral dispute over admission of video exhibits." (Id. at 6 n.5.)

### 6.     The Trial

#### a.     First Request For Mistrial

The first day of trial evidence commenced on Friday, March 2, 2001, with two witnesses who described the discovery of Ron Rudin's remains at Nelson's Landing. (ECF No. 85-11 at 167–226.) Two days later, on Sunday afternoon, March 4, 2001, Rudin talked to Wysocki and Dillard without counsel present. (ECF No. 65-24 at 16.) Rudin sent a letter to counsel through Dillard and Wysocki stating her concerns that Amador was unprepared to defend the case and requesting Pitaro take duties from Amador. (Id. at 17, 29.) Pitaro called the state district court judge on Sunday night to inform him of Rudin's concerns. (Id. at 13, 17.) Pitaro later attested "it was apparent to [him at that time] that the trial should not proceed" because "[t]he defense quite simply was not ready for trial." (ECF No. 70-8 at 69.)

On Monday morning, March 5, 2001, the state district court spoke with Rudin on the record in chambers outside the presence of defense counsel and the prosecution. (ECF No. 65-24 at 3–11.) By the time this colloquy occurred, Amador had persuaded Rudin that, notwithstanding her concerns with his representation, they should present a "unified front." (Id. at 3.) Accordingly, when the state district court asked what relief she sought, Rudin did not request a mistrial. (Id. at 5.) Rudin instead sought to have Pitaro take a more active role in the case. (Id. at 6.)

When the state district court brought in defense counsel, Amador referenced the impact of his breakup with Novack and the firing of her and her mother as his secretary less than a month before trial on his trial preparation. (Id. at 15.) The state district court indicated that if it declared a mistrial, it must assign reasons and those reasons would be unflattering to Amador. (Id. at 26, 28.) The state district court further stated, however, it did not believe the Strickland standard had been met and a mistrial could be avoided by Pitaro taking a more active role and allowing the

defense more time to prepare during the trial. (Id. at 29–31.) The prosecution expressed concern the court was building a record supporting a petition for post-conviction relief. (Id. at 32.)

### b.    Amador's Actions after Request for Mistrial

During the next seven days of trial, from March 5 to March 14, 2001, Amador was chided on numerous occasions regarding his cross-examination of witnesses. Amador showed witnesses evidence prior to laying a foundation for that evidence or was told by the state district court that he needed another witness to lay a proper foundation for the evidence he wished to discuss. (ECF Nos. 85-12 at 217; 65-25 at 124–25.) The state district court told Amador he needed to move on to a new subject, that he had exhausted a line of questioning, and that he needed to finish his examination of the witness. (ECF Nos. 85-12 at 226–27, 240; 65-25 at 116; 65-26 at 5, 52, 61, 68–69; 66-1 at 82; 66-3 at 2; 66-6 at 106, 121; 66-7 at 17, 49, 59; 91-23 at 339; 66-11 at 101, 123.) The state district court told Amador his questions were beyond the witness's expertise or should be directed to a different witness. (ECF Nos. 85-12 at 229, 243, 61; 66-7 at 12–13, 62.) The state district court told Amador to "address the Court," not opposing counsel. (ECF No. 85-12 at 233.) The state district court told Amador he needed to save any argument for his closing remarks. (ECF Nos. 6-25 at 114; 66-6 at 91–92.) The state district court told Amador he was wasting time. (ECF Nos. 65-26 at 61; 66-7 at 62.) The state district court scolded Amador for trying to skirt around one of its evidentiary decisions. (ECF No. 65-26 at 68.) And the state district court instructed Amador to "conduct [himself] properly" after he laughed at a witness. (ECF No. 66-7 at 16–17.)

During this period, the state district court also admonished Amador multiple times outside the presence of the jury about chronic tardiness and unpreparedness for cross-examination due to his disorganization, failure to mark defense exhibits, and failure to show exhibits to opposing counsel. (ECF Nos. 66-1 at 55–56, 64, 106; 66-2 at 12–15; 66-10 at 16–18.) The state district court

1 also complained that Amador failed to raise numerous evidentiary issues prior to trial. (ECF No.

2 66-2 at 41–42.) The state district court expressed frustration that Amador's lack of punctuality and

3 failure to do what he should have done previously were slowing down the trial.[44] (ECF Nos. 66-1

4 at 56; 66-2 at 13, 16, 44–45; 66-10 at 16–17.)

5   At the end of the sixth day of trial evidence, Monday, March 12, 2001, the state district

6 court noted a prominent local attorney had passed away. (ECF No. 91-23 at 347.) The following

7 day, the state district court excused Pitaro from the next trial day, the day of the funeral, because

8 Pitaro was to give the eulogy. (ECF Nos. 66-10 at 132; 91-24 at 83.) Amador thus was the sole

9 defense counsel present when Cantrell testified on March 14, 2001. (See ECF No. 91-24.) After a

10 brief portion of cross-examination, the state district court excused the jury for the day and chided

11 Amador for failing to present disputed issues by pretrial motion. (Id. at 124, 146, 150–51.) Pitaro

12 attested that he became aware later that evening that Rudin wanted to fire Amador. (ECF No. 70-

13 8 at 70.)

14    **c.**  **Second Request for Mistrial**

15   The morning of March 15, 2001, Amador and Pitaro met with Rudin and decided they

16 would once again address the court concerning the defense's lack of preparation. (ECF No. 70-8

17 at 70.) Due to this meeting, there were no on-record proceedings in the case until noon on March

18 15, 2001. (ECF No. 91-25 at 3.) At that time, the state district court noted outside the presence of

19 the jury that it was prepared to rule on the pending legal issues regarding Cantrell's cross-

20 examination, but it was advised defense counsel wanted to confer with Rudin on an important

21 issue. (Id.) Rudin then "ask[ed] for a mistrial because [she did not] believe Mr. Amador [was]

22

---

23 [44] Further, Pitaro attested that "[t]here were numerous off the record discussions concerning Mr. Amador's conduct during this period of the trial between the court and the attorneys." (ECF No. 70-8 at 70.)

prepared enough in the one area of talking with witnesses, there hasn't been any investigation." (Id.) The state district court recessed open court proceedings for an on-record proceeding in chambers with counsel for both the State and defense present. (Id.)

In chambers, Rudin stated inter alia, that: (1) at the time of earlier proceedings, she was afraid Amador was unprepared but did not ask for a mistrial because Amador told her if she did, she would get the public defender again and promised he would be prepared for the witnesses; (2) Amador, however, did not prepare, the files remained disorganized, and he failed to conduct necessary investigation of the witnesses; and (3) she realized during Cantrell's testimony that the defense was unprepared for witnesses and would not be prepared in time. (Id. at 4.) Pitaro then stated, inter alia, that: (1) the case was "not ready to go to trial," which was "obvious to any observer" because "this is not the way you try murder cases"; (2) Rudin was not getting a fair trial; (3) Rudin discussed numerous issues during their previous meeting that morning, including witnesses who were not interviewed and documents that should have been obtained and previously addressed by the defense; (4) a forensic accountant should have been hired; (5) the trial had been "a farce . . . and a mockery"; (6) there were witnesses he did not know about; (7) he was unaware before cross-examining a previous witness that the witness had testified before the grand jury because Amador's files were not prepared; (8) Amador "took on a burden that he should not have taken on"; and (9) he would have liked to have some testing completed, including DNA testing, but there was not enough time. (Id. at 5–7.)

Amador admitted, inter alia, that: (1) he did not "hav[e] sufficient background investigation or impeachment information for the witnesses that [were] yet to come;" (2) he spent time and effort on "portions of the case to the detriment of" other portions, including investigating Cantrell; (3) he "probably made a mistake in terms of the time spent in some areas when it should have been

spent on witness preparation"; (4) some witness files were empty because they still needed to be investigated; (5) "there wasn't enough time [or] money to do what really needed to be done [for] the enormity of this case"; (6) his "efforts in the opening statement were inadequate" because he "was overwhelmed and [he] could hardly think"; (7) he could have done a better job with cross-examining witnesses with more investigation; and (8) "[t]he remedy . . . of a mistrial based up on a manifest necessity . . . ha[d] been met." (Id. at 9–10.) Wysocki added be believed, based on his experience, that "there [was] still a number of things that [he] would think as an investigator still need[ed] to be done." (Id. at 11.)

The proceedings continued in the courtroom, outside the presence of the jury, and, although Amador said he believed the defense had "won every witness" so far, he reiterated that he failed to ask for a continuance at the calendar call and erroneously stated he was ready to proceed to trial. (Id. at 12–14.) The state district court recessed until Monday, March 19, 2001, when it would announce a decision on the motion for mistrial. (Id. at 16–17.)

On March 19, 2001, outside the presence of the jury, the state district court denied the motion for mistrial, reasoning, inter alia, that: (1) there is no authority for finding counsel ineffective without a final judgment, (2) no prejudice had resulted at the present time, (3) there were no fatal defects in the proceedings, (4) judicial economy weighed on the side of continuing the trial, and (5) granting a mistrial "would be setting a dangerous precedent if, after an attorney announced ready for trial, he was allowed to throw in the towel because . . . he felt his performance was deficient in some areas." (ECF No. 91-26 at 22–26.) The state district court held the defense would be allowed "some additional time to prepare at the start of their case in chief." (Id. at 25.)[45]

---

[45] Pitaro attested that "[a]fter the March 15, 2001[,] hearing it was obvious to [him] that this case was going to conclude to verdict no matter what the problems were." (ECF No. 70-8 at 70.) And even though Rudin "would ask [him] to bring the problems to the attention of the court, she, when

### d.    Amador's Actions after Second Request for Mistrial

During the next fourteen days of trial, from March 19 to April 10, 2001, Amador was again chided on numerous occasions. First, Amador was admonished regarding his cross-examination of witnesses, especially his failure to move along in questioning. (ECF Nos. 91-26 at 75; 66-25 at 44; 67-3 at 48; 67-25 at 48; 67-27 at 33; 85-17 at 53, 78–79, 86.) Indeed, on April 9, 2001, the state district court told Amador it could not keep "on allowing [him] to ask the same questions over and over." (ECF No. 85-17 at 86.) And later that day, after Amador brought up a subject—quiet title—that he was told to move on from, a recess was taken, and the state district court stated that Amador was taking "cheap shots." (Id. at 122.) The state district court then admonished Amador:

> [D]on't go into that anymore. Do you understand that? I'm warning you: Don't go into it. I'm not going to issue sanctions now. Certainly, at the end of this trial, I'm going to take a look at sanctions here. But don't go into that now. Don't repeat yourself with the quiet title.
> . . . .
> As far as sanctions, I'm building a record and, at the appropriate time - - I don't want to put a chilling effect on Miss Rudin's defense, but, certainly, I'm going to listen to sanctions at the appropriate time

(Id. at 123–24.)

Second, in addition to cross-examining witnesses ad nauseam, Amador ignored the state district court's instructions. On April 5, 2001, the state district court noted it had asked the attorneys "to get together to talk about . . . documents" the prior day. (ECF No. 67-27 at 74.) When asked if that occurred, the State stated it told Amador it needed thirty minutes following the end

---

push came to shove, would opt for the trial to continue with [Pitaro] constantly being asked to take on more and more responsibility for the case." (Id.) Dillard confirmed that "as the trial progressed, Mr. Pitaro had to take more and more responsibility due to Mr. Amador's absence." (Id. at 83.)

of court proceedings on April 4, 2001, and Amador told the State to call him on his cellular telephone. (Id. at 75.) The state complied, but Amador indicated he was unavailable and wished to meet in the morning. (Id.) Amador said he would be at the courthouse at 8:00 a.m. on April 5, 2001, but when the State arrived at the designated time, Amador was not present. (Id.) Because the State had to meet a witness, it left the documents with a court staff member. (Id.) Amador did not give the State his documents, and the State did not see Amador that morning until 9:20 a.m. (Id. at 76.) The state district court admonished Amador:

>That's why we were late coming to court, because Mr. Amador strolled in at 9:20.
>
>Mr. Amador, I took my time out because I know - - and I don't like yelling in court. I don't - - but I do have a job.
>
>As a judge, I have to control the court. I have to control the flow of the case. I try the best I can.
>
>And outside the presence of the jury, I asked you to get together with [the State], exchange documents so you could thoroughly look at it and we wouldn't have to waste valuable court time.
>
>It's not my time. I get paid for this. I don't care if I'm here. If I'm not doing this trial, I'm going to do ten other trials coming up. I have so many stacked up.
>
>I'm worried about that jury. I worry about you, your case, the State's case. The flow is very important to a criminal case. You have to have a nice flow.
>
>If it's choppy and disjointed, it's going to affect a fair trial, both to the State of Nevada and to the defendant.
>
>All I do - - because I have a little experience, I ask you to get together, exchange documents, so we don't have this choppiness. And I have to - - this jury has been here six, seven weeks now. It's tough.
>
>Not only that, apparently - - and I want to hear from you - - you don't do what I ask you to do, but you show up late. I like to start court on time. It's not because of me. I'm a dictator. But I want this jury - - let's move on and go there.

46

(Id. at 76–77.) Amador blamed his tardiness on not having received his scheduled wakeup call from his hotel. (Id. at 78.) The state district court responded: "This is maybe the fourth or fifth time I've admonished you, but I'm doing this outside the presence of the jury. I don't want to embarrass you in the jury's presence." (Id. at 79.)

Third, the state district court discussed Amador's pretrial motion practice and the effect it had on the trial. On April 9, 2001, the state district court commented on the lack of communication between the defense and the prosecution, noting "the blame originally goes to Mr. Amador with his frivolous motions in the beginning." (ECF No. 85-17 at 185, 189.) The state district court also commented later about Amador's failure to file pretrial motions: "these should have been done six, eight months ago, motions to suppress evidence and testimony. This is not the way to run a trial. I never heard of this." (Id. at 241.) Similarly, on April 10, 2001, following a suppression argument by the defense, the state district court stated:

> Here I gave ample opportunity to file a motion to suppress. In fact, I encouraged both sides. . . . And I was even more careful in this case. I gave everybody an opportunity to file a motion; and, in fact, I think Mr. Amador filed some 70 pretrial motions in this case. But some of the motions were motions to dismiss for outrageous conduct, motions to dismiss the D.A., disqualify, motions to reveal a deal, motions for disclosure, prior bad acts, improper prosecutorial argument, disclose rebuttal witness. It goes on and on. Not once I had a motion to suppress and all of the facts were known at that time.

(ECF No. 68-5 at 87–88.)

### e.   Appointment of John Momot

On March 29, 2001, Pitaro explained to the state district court, inter alia, that: (1) he submitted "an order asking that John Momot be appointed, at no cost to the State, to aid the defense"; (2) Momot offered assistance after Pitaro requested it "based upon a lot of concerns in this case," including the "volume" of the case; and (3) the defense was doing their best to keep the

1  trial moving, but it "had a lot of problems." (ECF No. 67-4 at 7–8, 13.) The state district court

2  appointed Momot pro bono, stating "additional counsel should be appointed because of the

3  complexity of this case and the number of factual and legal issues involved, and considering the

4  severity of the offense and the time necessary to provide an adequate defense for the defendant."

5  (Id. at 15.) Pitaro later attested "Momot assumed responsibility for some of the witnesses." (ECF

6  No. 70-8 at 70–71.)

7                               **f.      Defense Case-in-Chief**

8          After the state rested on April 10, 2001, the trial was recessed for the remainder of the

9  week. (ECF No. 68-5 at 57–58.) The defense case-in-chief began on April 16, 2001. (See ECF No.

10  68-7.) The defense presented nineteen witnesses, including some previously called by the State.

11  The defense also read DeFlorentis's voluntary police statement and grand jury testimony to the

12  jury, and presented a life-size model of a portion of the Rudin bedroom. (See ECF No. 68-19 at

13  32.)

14          Amador presented the testimony of Dr. Clauretie, who, as discussed previously, reviewed

15  the Lee Canyon property documents from 1981 until 1996 and testified Ron used fictitious names

16  during his real estate transactions and sold parcels of his property to himself to likely inflate the

17  value of his property. (ECF No. 68-23 at 72, 79–80, 100.) Following Dr. Clauretie's testimony,

18  the state district court noted the following:

19              I've handled - - as you have, we all have; we've been in the system - - I've
                resided over and handled when I was an attorney, I can't count the number
20              of murder trials, and it always seemed to me a ridiculous thing all these
                deeds.

21
                The jury is not present, so - - I think it just confused the jury and it wasn't
22              necessary. It wasn't a clean solid trial, as I think it should have been, with
                the muddying up of all these documents.

23

48

> But there was always that thing, Mr. Amador went into, to say it showed somebody else could have had a motive, and because a murder trial is so important to both the State and defense, I didn't want to cut out maybe a theory of the defense.
>
> Because a lot of judges sometimes do that and they are wrong. It's not fair to the defendant. And maybe they are reversed.
>
> But I don't care about reversal, but, certainly, I want to make sure we only do this one time and we are fair to everybody.
>
> I never really agreed with all these deeds. I think the jury is fed up with these deeds. They have heard enough of it, and whoever came up with this idea, I think, was totally wrong.
>
> But that's my opinion and my opinion really doesn't count here.

(Id. at 186–87.)

The record shows that at least a fair portion of the preparation of Rudin's defense was completed after the trial commenced because, inter alia, the defense did not retain their fire expert until the end of February 2001, did not meet with defense-witness Raesbeck until March 24, 2001, did not apply for the retention of Dr. Clauretie until the end of March 2001, was still attempting to locate individuals to testify in April 2001, and did not move to admit DeFlorentis's statements until mid-April 2001. (ECF Nos. 68-8 at 12; 67-10; 67-32; 68-11; 68-23 at 31.)[46]

### 7.   Closing Arguments

Following the State's closing argument, the state district court allowed Amador and Pitaro to both argue for the defense. (See ECF Nos. 69-5 at 118; 69-6 at 9.) Following Amador's portion of the closing argument, the state district court stated outside the presence of the jury:

---

[46] During Amador's cross-examination of Wolson, who was presented during the state's rebuttal case, Amador was admonished twice to stop making comments about himself, was told to stop repeating himself, and was reprimanded for interrupting on several occasions. (ECF Nos. 68-25 at 27, 32; 68-26 at 9, 25, 26–27.)

49

> This Court feels you sandbagged the Court, Mr. Amador. You sandbagged me, you lied to me, you lied to the D.A. You said, and I elicited that you wanted to split your argument up on Mr. Pitaro, and that's only in capital cases. I went out of my way to allow you to split up your argument with the explicit condition you're going to be about a half-hour, that you're going to limit your comments and remarks just to those trustees and you didn't live up to your bargain. You lied to the Court, you sandbagged the Court and I don't like that and I don't appreciate that.
>
> You went through everything here from trust documents to Melton to the 48-hours rule, the directives, to credibility of Boscutti, Pat Brown, Margaret Rudin's financial condition, Tony Desio, which I never heard he was looking for Rudin. Who killed Rudin, the fire pit, where he was burned, the hand, the skull, the bracelet, cremation, Rudin's mistress. I mean, I don't know what to do here. Am I to limit now Mr. Pitaro from not going into these arguments?

(ECF No. 69-6 at 7–8.) The state district court then asked Amador: "Did you or did you not tell me you're going to limit the arguments to about 30 minutes and just to the trustees?" (Id. at 8.) Amador replied: "No, I didn't say that." (Id.) The state district court replied, "I don't want to bother with you. I don't even want to bother with you." (Id.) Later, during a break in Pitaro's closing argument, the state district court cited a portion of the record from two days prior in which "Mr. Amador promised [the court] and said he would just do a half-hour, just the 'financial matters,' his own words." (Id. at 78–79.) The state district court then stated:

> The one thing that our court system of law relies on really, the one thing our system of law relies on, the one thing that judges rely on is an attorney's word. As an officer of the court attorneys are under an obligation and a duty to which they are sworn to be candid towards the Court. For without judges being able to rely on attorneys' statements we might as well throw out the whole system.
>
> Regardless of the outcome of this case, and I don't care how it ends up, you, Mr. Amador, have lost this Court's respect and believability and, most important, due to your constant misstatements of facts you have lost all honor before this Court.

(Id. at 80–71.)

50

### 8. Deliberations and Verdict

On April 30, 2001, during jury deliberations, the state district court had a meeting in chambers about an issue with a juror. (See ECF No. 69-10.) The state district court asked Pitaro about Amador's absence, and Pitaro stated he called Amador, but his cellular telephone was off. (Id. at 10.) The state district court responded, "[w]e cant [sic] be at his beck and call. I have to resolve this issue now." (Id.) After Amador arrived, the state district court said, of Amador, "I don't want him addressing me, I don't trust him. If he wants to say something he's to go to [Pitaro]. He whispers in your ear, Mr. Pitaro, and you tell me what he wants to say, I don't want him addressing this Court." (Id. at 11.)

On May 1, 2001, while the jury was deliberating, the state district court had another meeting with the parties about a juror. (ECF No. 69-11.) During that meeting, the state district court asked whether Amador was sleeping in court, indicating that "[h]e just has a habit of sleeping in court." (Id. at 29.) Amador said he closed his eyes but was paying attention. (Id. at 30.)

The following day, May 2, 2001, after the jury's verdict was read, the state district court made closing remarks to the jury and thanked everyone except Amador. (ECF No. 69-15 at 9–11.)

### 9. Trial Preparation Issues Identified by Co-Counsel

In support of Rudin's motion for a new trial, Pitaro attested, inter alia, that (1) it was "apparent to [him] that this trial was too complex for any one attorney to handle without months and months of constant preparation" due to the "shear [sic] volume of the documentation and the complexities of the relationships among the various players in this case," and (2) he, Momot, Dillard, and Wysocki "worked long hours trying to keep the Rudin trial afloat" because "[t]he trial preparation and investigation was continuing sometimes just hours ahead of the trial." (ECF No. 70-8 at 71.) At the post-conviction evidentiary hearing, Pitaro attested, inter alia, that (1) he

needed six months to properly prepare Rudin's case for trial, (2) the defense team put their defense together as the trial unfolded such that "the preparation that [one] would hope normally would be done before the trial starts was being done during the trial," (3) the defense was "involved in a massive two-month discovery process while the case was going on," (4) the defense cross-examined witnesses without the assistance of defense experts because defense experts, in some instances, were not yet hired or had not yet prepared reports, and (5) the defense team, in some instances, learned witnesses testimony during trial, and regarding one particular witness, Pitaro found out during his trial testimony that he had testified before the grand jury, and, as such, the defense lacked his grand jury transcript for cross-examination purposes. (ECF No. 74-8 at 8, 11, 13, 22, 26.)

Similarly, Momot testified at the post-conviction evidentiary hearing, inter alia, that (1) he needed at least six months to prepare a proper defense, (2) "certain things were found out during the course of the trial that" would have "measurably impacted the way the case was presented to the jury from the opening statement on and strategy of the case" if they were known prior to the start of trial, (3) the defense was "try[ing] to catch up midstream" and put their case together as the trial went along, which should not have been done in "a complex case with a lot of forensics." (ECF No. 74-8 at 31–32.) And in support of Rudin's motion for a new trial, Dillard attested, inter alia, that (1) the defense needed "ideally . . . six months in order [to] prepare an adequate defense for Mrs. Rudin given the volume of material, the number of witnesses, expert witnesses that yet needed to be contacted and consulted with as well as just the overall complexity of the case"; (2) "very little preparation and or meaningful investigation had been done in the many months prior to [his] involvement"; and (3) "the defense investigation was done literally on the fly hour by hour and day by day." (ECF No. 70-8 at 82–83.)

10.    **Amador's Actions Outside Courtroom**

In support of Rudin's motion for a new trial, Jackson attested, <u>inter alia</u>, that (1) Amador usually failed to attend pre-scheduled meetings with Pitaro, Dillard, and Wysocki on the weekends during trial,[47]  (2) rumors surfaced that Amador used drugs during trial,[48] (3) Amador stopped her from providing the public defender's office with Rudin's full file after he was fired, and (4) Amador never returned some of Rudin's personal belongings. (ECF No. 70-8 at 77–78.) Jackson also attested that Amador told her that "during much of the trial itself, . . . he spent most of his evenings at strip bars, and in the company of strippers." (<u>Id.</u> at 76.) According to Jackson, Amador "bragged about the many strippers he was dating," and strippers "were calling and even coming over to the office during business hours." (<u>Id.</u>) Jackson's account was consistent with the affidavit of a valet parking attendant who worked the graveyard shift at the Four Queens Hotel and Casino at the time of the trial. (<u>See</u> ECF No. 70-21 at 4–5.) Billie Anderson attested that Amador typically would be with a certain woman who would stay until about 2:00 a.m., and shortly after she left each night, Amador typically then would leave and return at about 3:00 a.m. with different women each night, who would stay until about 6:00 a.m. (<u>Id.</u>)

III.    <u>**DISCUSSION**</u>

In Ground 1, Rudin alleges that her Fifth, Sixth, and Fourteenth Amendment rights were violated due to Amador's ineffective assistance. (ECF No. 100 at 64.)

---

[47] Dillard confirmed "[t]here were continuous meetings to discuss trial strategy, results of witness interviews," but "Amador seldom attended [these] meetings and if he did attend, he would find an excuse to leave before the meeting concluded." (ECF No. 70-8 at 83.)

[48] Rudin also believed Amador was using drugs, but Amador denied the allegations. (ECF No. 69-18 at 7, 25.)

## A.      Legal Standard – Ineffective Assistance of Trial Counsel

In Strickland v. Washington, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. Additionally, to establish prejudice under Strickland, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

## B.      Procedural Default

The respondents argue that Rudin's ineffective-assistance-of-trial-counsel claim is procedurally defaulted. (ECF No. 54 at 4.) Indeed, the Nevada Supreme Court determined that Rudin's state habeas petition was untimely pursuant to Nev. Rev. Stat. § 34.726 and thus procedurally barred.[49] (ECF No. 75-19.) Accordingly, under the procedural history of this case,

---

[49] Although Rudin argued that Amador "was unable to adequately prepare for trial depriving her of her right to a fair trial" on direct appeal, the Nevada Supreme Court reserved ruling on Amador's ineffectiveness:

> We note that the dissent concludes, based upon Amador's apparent conflict of interest, that we are obligated to reverse and order a new trial. While we certainly share our colleagues' concern for Amador's unprofessionalism, we reiterate our observation that Rudin's claim concerning Amador's conflicts remain just that—a

54

Rudin's ineffective-assistance-of-trial-counsel claim is procedural defaulted, subject only to the question of whether Rudin can overcome the procedural default under <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012).

The principal issues before this court therefore, in context,[50] are: (1) whether Rudin's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Rudin's state post-conviction counsel was ineffective in raising this claim in the state district court; and (3) if so, whether, on the merits, Rudin was denied effective assistance of trial counsel by Amador. <u>See, e.g.</u>, <u>Atwood v. Ryan</u>, 870 F.3d 1033, 1059–60 (9th Cir. 2017); <u>Detrich v. Ryan</u>, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, this court's review is <u>de novo</u>.[51] <u>See</u> <u>Ramirez v. Ryan</u>, 937 F.3d 1230, 1243 (9th Cir. 2019); <u>Atwood</u>, 870 F.3d at 1060 n.22.

## C.   Rudin's Ineffective Assistance of Trial Counsel Claim is Substantial

A claim is "substantial" under <u>Martinez</u> if it has "some merit," to which the Supreme Court refers to the standard for issuance of a certificate of appealability. 566 U.S. at 14. Under that standard, a petitioner must make a "substantial showing of the denial of a constitutional right" as

---

claim. The existing rule, and the better rule, requires that this issue, along with the general issue concerning Amador's ineffectiveness must be examined in a separate post-conviction proceeding at which time Rudin's post-conviction attorney will examine the entire record, interview all relevant witnesses and present the matter to the district court for a full and complete airing and decision.

(ECF No. 72-18 at 3, 33–34.)

[50] It has not been disputed herein (1) that a state post-conviction proceeding in the state district court was an initial-review collateral proceeding for purposes of <u>Martinez</u>, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the <u>Martinez</u> rule. <u>See generally</u> <u>Rodney v. Filson</u>, 916 F.3d 1254, 1259–60 (9th Cir. 2019). This Court thus need not further discuss these additional contextual background requirements.

[51] Because this court reviews Rudin's ineffective-assistance-of-trial-counsel claim <u>de novo</u> and grants Rudin a conditional writ thereon, such that her remaining claims for relief are mooted, as discussed further below, this court does not apply the standard of review articulated in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). <u>See, e.g.</u>, 28 U.S.C. § 2254(d).

to which "reasonable jurists could debate" essentially the proper disposition of the constitutional claim, such that the issue presented is "adequate to deserve encouragement to proceed further." See Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (internal quotation marks omitted). This standard does not require a showing that the claim will succeed, only that its proper disposition could be debated among reasonable jurists. Id. at 337–38.

In the present case, Rudin's ineffective-assistance-of-trial-counsel claim is a substantial claim for purposes of Martinez. As discussed further below, Amador's failures before and during Rudin's trial clearly constituted deficient performance. And the question of whether Rudin sustained resulting prejudice to satisfy the Strickland standard can be debated by reasonable jurists on the record presented.

### D.   Rudin's State Post-Conviction Counsel Was Ineffective

This Court must determine whether Rudin's state post-conviction counsel provided ineffective assistance in the state district court post-conviction proceedings, under the standard for constitutional claims of ineffective assistance of counsel established in Strickland. See Rodney v. Filson, 916 F.3d 1254, 1259 (9th Cir. 2019). In this context, Rudin must show both that her post-conviction counsel's performance was deficient and that she sustained prejudice because there was a reasonable probability the result of her post-conviction proceedings would have been different absent the deficient performance. Id. at 1260. This prejudice issue and the merits of Rudin's claim of ineffective assistance of trial counsel substantially overlap. See Atwood, 870 F.3d at 1059–60.

The Nevada Supreme Court's remittitur on direct appeal was issued on April 27, 2004. (ECF No. 73-3.) Nevada law required Rudin to file her state post-conviction petition within one year of the Nevada Supreme Court issuing that remittitur. See Nev. Rev. Stat. § 34.726(1). Thus,

Rudin had until April 27, 2005, to file her petition for post-conviction relief in the state district court.

On April 30, 2004, Rudin's appellate counsel moved to withdraw as counsel and asked the state district court to appoint post-conviction counsel. (ECF No. 73-5.) Rudin, proceeding pro per, filed a similar motion on July 14, 2004, also seeking appointment of post-conviction counsel. (ECF No. 73-7.) On November 24, 2004, the state district court granted Rudin's motion and appointed Dayvid Figler to represent her. (ECF No. 73-11.)

In its March 10, 2015, order holding that Rudin was entitled to equitable tolling on her federal petition, the Ninth Circuit explained the events that occurred next:

> At the November 2004 hearing at which the state court appointed Figler to represent Rudin, Rudin attempted pro per to file with the court a series of papers . . . Pursuant to the applicable local rules, however, the court declined to accept them and instead "turned [them] over to Mr. Figler." But Figler never filed them with the court.
>
> . . . .
>
> The record suggests that . . . substantial confusion arose between the parties and the court about whether Rudin had already filed a petition for post-conviction relief. On January 5, 2005, for example, the state court held a status hearing on Rudin's "opening brief." The court's use of the term "opening brief" suggested that the parties and the court believed that Rudin's initial petition for post-conviction relief had been filed but that Rudin had yet to file a brief in support of that petition. See Nev. Rev. Stat. § 34.735 (establishing the form of a petition). At the same status hearing, the court granted Figler a continuance, extending his time to file the "brief" and setting a second status hearing for July 13, 2005. At the July 13th status hearing, Figler again requested "an additional 90 days to file his brief," which the court granted the following week. By that date, both of Petitioner's one-year limitations periods for filing her requests for collateral relief had run. But nobody—neither Figler, nor the State, nor the court— recognized that to have occurred. On January 18, 2006, the post-conviction court again granted Figler an additional "45 days in which to file his opening brief due to the voluminous record in this case." The State would later confirm that, at that time, the State and the court were "under the mistaken impression" that a petition had already been filed.

(ECF No. 26 at 11–13 (internal footnotes omitted).)

The Ninth Circuit then reviewed Figler's actions during his representation of Rudin:

> Rudin became concerned—and we believe rightfully so—that Figler was not adequately representing her in her collateral review proceedings. According to Rudin, at some point in 2005, she requested that Figler provide her with copies of her file. Figler did not immediately respond. Figler visited Rudin only a handful of times that year, but he did not interview the witnesses she identified, and he never informed her that he had requested a series of continuances on the basis of the "complexity" of her case. Figler last visited Rudin in May 2006, which was the first time in almost a year that he had done so.
>
> In November 2005, Rudin began to gather information in support of her soon-to-be-filed motion to substitute counsel. First, she submitted an Inmate Request Form to the prison staff asking for a summary of the attorney visits she had received that past year. In a response dated a few weeks later, the staff informed her that she had received four visits in 2005, occurring on January 4, February 7, February 25, and June 17. In January 2006, after multiple failed attempts to contact Figler, Rudin submitted a second Inmate Request Form notifying prison staff that she had "not been able to call [her] attorney since [December 15, 2005]" and requesting that the staff fix the problem, which she was concerned was "at this facility." Three weeks later, the prison staff responded, informing Rudin that Figler had a collect call block on his office phone and that Rudin would need to send a letter to Figler requesting that the block be removed. At the same time, Rudin's friend, who was not in prison, "repeatedly . . . requested [that Figler] visit [Rudin]; have the telephone block removed; not postpone [Rudin's] post conviction brief filing; and send her a copy of the opening brief," all to no avail.
>
> Figler never filed anything with the state post-conviction court. On April 5, 2006, 511 days after Figler was appointed, Rudin moved to substitute counsel. In her motion, she described Figler's inadequacies and expressed her "grea[t] concer[n] that she [was] not receiving adequate representation regarding her post conviction." At a hearing on July 17, 2006, the court granted her motion and, at the same time, appointed attorney Christopher Oram.

(Id. at 13–15.) Oram filed Rudin's state post-conviction petition on August 21, 2007. (ECF No. 74-1.)

Based on Figler's failure to support Rudin's request for post-conviction relief, consistent with the Ninth Circuit's findings, this Court finds Figler's "representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. These failures resulted in the untimely filing of Rudin's state post-conviction petition, such that the Nevada Supreme Court determined that Rudin's state post-conviction petition was procedurally barred. (ECF No. 75-19.) Consequently, because Rudin's ineffective-assistance-of-trial-counsel claims is meritorious, as is discussed below, Rudin sustained prejudice due to Figler's deficiency because there is a reasonable probability that the Nevada Supreme Court would not have reversed the state district court's granting of Rudin's state post-conviction petition if it had been timely filed. Strickland, 466 U.S. at 694.

**E.    Rudin Was Denied Effective Assistance of Counsel by Amador**

Rudin has made a compelling showing that Amador's performance as her trial counsel was objectively unreasonable. Strickland, 466 U.S. at 688. The Strickland standard is highly deferential even on de novo review, and courts must apply a strong presumption that counsel's representation fell within the wide range of reasonable professional assistance. See Harrington v. Richter, 562 U.S. 86, 104–05 (2011). However, under Strickland, only "strategic choices made after [a] thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. And courts do not apply presumptions, even strong ones, blindly without regard to the record before them. Cf. Richter, 562 U.S. at 109.

Here the record demonstrates Amador failed to conduct a thorough investigation prior to the commencement of Rudin's trial. Indeed, the most salient point regarding Amador's representation is the lack of defense preparation. First, the record demonstrates a consistent theme, presented by multiple witnesses, demonstrating Amador was absorbed in his own personal

interests and affairs leading up to trial. Amador took an extensive European vacation a few months before trial. He ended his relationship with Novack, which resulted in the reduction of his office staff to one relatively new staff member. He utilized his in-office visits with Rudin to film clips for 48 Hours, and he cooperated with a reporter to get an article published about Rudin in the National Enquirer in order to increase media attention on the case. Second, Amador failed to fully review the extensive discovery in the case. He failed to consult defense experts beyond Streed, resulting in Pitaro having to locate expert witnesses two weeks prior to the start of and during trial. He failed to interview possible defense witnesses and State witnesses. He failed to subpoena witnesses, and he failed to initially hire fruitful investigators. Third, some of the work that Amador did—namely, researching Ron's business dealings and filing frivolous motions—was unprofitable and was conducted in lieu of preparations necessary to competently defend a murder trial.

Amador's trial preparation inadequacies resulted in Pitaro stating the defense was not ready when the trial began and informing the state district court several weeks into trial that Rudin was not receiving a fair trial, the trial was a "mockery," and defense preparations were still incomplete. And later, during post-conviction proceedings, Pitaro testified he would have needed six months to properly prepare Rudin's case for trial. And because that did not happen, the defense team was developing and flushing out the details of the defense literally on almost a daily basis during the trial.

Moreover, the harm wrought by Amador's lack of preparedness was exacerbated by his erratic and incompetent acts once trial began. Amador gave a disjointed, improper and ineffective opening statement that did not actually outline the defense for trial. He repeatedly, even after numerous warnings, ran afoul of the state district court with his repetitive and interminable questions and his failure to raise evidentiary issues prior to trial. He made blatant

misrepresentations to the Court, such as his promise to the state district court regarding the content and length of his closing argument, which resulted in the state district court stating that Amador lost the court's respect and could no longer personally address the court. The record also reflects a pattern of trial mishaps and errors which demonstrated Amador's lack of preparation and inability to present a coherent defense. This included Amador forgetting to bring files to court, showing evidence prior to laying a foundation, arriving late to court, failing to timely mark exhibits, and sleeping in court. And there is at least some evidence that this deficient trial conduct derived in part from late night liasons into the wee hours of the night and the use of drugs during the trial.

Amador's patent failures to prepare and present a major murder case permeated Rudin's case such that the addition of Pitaro and Momot to the defense team was a remedy made far too late to save a case that was in irreparable crisis.[52] Accordingly, it is apparent that Amador's representation of Rudin "amounted to incompetence under 'prevailing professional norms'" and "fell below an objective standard of reasonableness." Harrington, 562 U.S. at 105; Strickland, 466 U.S. at 688, 690. Notably, this conclusion about Amador's performance is not made with any distorting effects of hindsight, as, importantly, even Amador admitted on March 15, 2001, during the second discussion about a mistrial, that his opening statement was inadequate, that he could have done a better job cross-examining witnesses had he prepared, that he failed to properly prepare the case for trial, and that he erroneously told the state district court he was ready for trial.

Rudin has also made a compelling showing that there is a reasonable probability that, but for Amador's unprofessional errors, the result of her trial would have been different. Strickland,

---

[52] Notably, the dissenting opinion on Rudin's direct appeal concluded that "Amador's behavior made it virtually impossible for Rudin to receive a fair trial, even with the addition of Pitaro to the defense team." (ECF No. 72-18 at 48.)

466 U.S. at 694. First, Amador's opening statement negatively shaped the jury's impression of the defense case. Pitaro testified at the post-conviction evidentiary hearing that he believed the "most important part of a trial is the opening statement" because "the mind-making process is one that starts at the opening statement." (ECF No. 74-8 at 9.) And here, according to Pitaro, Amador gave an incohesive, lacking opening statement that was incurable during the remainder of the trial, including the closing statement.[53] (Id. at 9–10.)

Second, the late hiring of defense experts and failure to prepare them hindered the defense's challenge to the State's case. Pitaro testified at the post-conviction evidentiary hearing that the defense was cross-examining State witnesses without the assistance of defense experts because those defense experts, in some instances, were not yet hired or had not yet prepared reports. (Id. at 26.) Relatedly, the defense team, in some instances, learned the substance of witness testimony during the trial, and regarding one witness, Pitaro only learned during his trial testimony that he testified before the grand jury, resulting in the defense lacking his grand jury transcript for cross-examination purposes. (Id.)

Third, regarding the importance of primacy in persuasion, defense evidence was poorly presented due to a lack of pre-trial investigation of crucial evidence. For example, Pitaro attested that "if the evidence . . . concerning Mrs. Rudin's request for a search" of Ron following his

---

[53] Notably, the dissenting opinion on Rudin's direct appeal concluded that "[t]here can be no doubt that Amador's opening statement prejudiced the defense, and it remained with the jury until the end of the trial." (ECF No. 72-18 at 45.) The dissenting opinion explained the following:

> The opening statement of a criminal case is extremely important in asserting a successful defense. In fact, studies have repeatedly shown that the impression a juror has after opening statements usually carries with him or her to become the verdict in the case. For that reason, by the end of opening statements, Rudin was already at a great disadvantage even though no evidence had been presented.

(Id. at 36–37 (internal footnotes omitted).)

disappearance "had been known and utilized" during opening statements and "in the examination of witnesses during the first week of trial by the defense, the prosecution theory that Mrs. Rudin was unconcerned over her husband's disappearance would have been debunked and the credibility of the witnesses seriously undermined at the beginning of the trial." (ECF No. 70-8 at 71; see also ECF No. 74-8 at 11–12.) Similarly, if Pitaro had earlier known about Shaupeter's testimony concerning the trunk size, he would have cross-examined Honabach with that information to cast doubt on Honabach's credibility and other testimony. (ECF No. 74-8 at 12.) Momot confirmed during his post-conviction testimony that "certain things were found out during the course of the trial that" would have "measurably impacted the way the case was presented to the jury from the opening statement on and strategy of the case" had they been known prior to trial. (Id. at 31.)

Regarding the overall effect of these trial issues, Pitaro attested it was his "opinion that if the superb investigation that was done by Mr. Wysocki and Dillard while the trial was continuing had been done pretrial[,] it is reasonable to assume that the result [of the trial] would have been different." (ECF No. 70-8 at 71; see also ECF No. 74-8 at 14.) Likewise, Dillard attested that "[i]t [was his] opinion that in a case of this complexity, proper presentation could have very likely yielded a different resolution." (ECF No. 70-8 at 83.)

In addition to Amador's opening statement disadvantaging the defense from the outset of trial, the defense lacking necessary information to impede the State's case from gaining momentum, and the belated presentation of defense evidence,[54] there was only contestable,

---

[54] Notably, the dissenting opinion on Rudin's direct appeal concluded:

> It is unrealistic to think that the jurors could have put out of their minds all the evidence and adverse events, including the continual admonishment of defense counsel by the district court judge; the bizarre opening statement; the constant continuances and delays throughout the trial, which I am sure were held against the defense; and the belated presentation of important evidence.

circumstantial evidence supporting Rudin's guilty verdict.[55] See Strickland, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). There was no evidence that Rudin took Ron's gun as Ron had speculated, no evidence that Rudin was seen with the gun, and no forensic evidence linking Rudin to the gun used to kill Ron. The forensic evidence purporting to establish that Ron was killed in his bedroom while asleep was subject to qualification and contested by defense experts. Cantrell's testimony concerning Rudin's admissions and conduct before and after Ron's disappearance was limited by Rudin and Cantrell's lifelong, estranged relationship. Lovato's testimony concerning his observations while working in Rudin's residence was constrained by implications that he acted to receive reward money and lied to the grand jury. Allegations that Sharon assisted Rudin in murdering Ron were rebutted by Sharon's denial of any personal wrongdoing and refusal to implicate Rudin even though he was granted immunity. Allegations that Rudin remodeled the bedroom into an office to cover up evidence of a crime was disputed by testimony that law enforcement observed the bedroom prior to the remodel and found nothing of interest. Allegations that Rudin transported and burned Ron's body in an antique trunk from her store were contradicted by defense witnesses who testified Rudin did not possess a similar trunk and an expert witness who testified Ron was not entirely burned at the site where his remains were found. And allegations that Rudin fled because she was guilty of Ron's murder were defended by claims that Rudin felt she could not receive justice or a fair criminal trial due to her defeat at

---

(ECF No. 72-18 at 50–51.)

[55] Similarly, the state district court stated, in ruling on Rudin's post-conviction petition, that "[t]he proof of [Rudin's] guilt was not a slam dunk by any stretch of the imagination." (ECF No. 74-8 at 6.)

the hands of Ron's trustees, which included their collaboration with law enforcement, at the civil

trial on Rudin's beneficiary entitlement.[56]

Further, any argument that Rudin had the sole means and motive to murder Ron is

challenged by a list of other possible suspects: the beneficiaries of the trust who gained from Ron's

death and Rudin's elimination from the trust, associates of the Crazy Horse Too where Ron's

vehicle was found with evidence of several individuals having been present, nefarious individuals

Ron encountered at the Oasis Motel, one of Ron's disgruntled tenants, the investors Ron was

working with from Chicago on his Lee Canyon project who were impliedly associated with the

mob,[57] or someone upset about Ron's affair with Lyles.

Therefore, considering the totality of the evidence before the jury,[58] this Court determines

there is a reasonable probability that, absent Amador's pervasive errors, the result of Rudin's trial

---

[56] Pitaro made the following comment during closing argument:

> You see, no one can stand up to the powers, no one can stand up when the
> police are out there aiding civil litigants, that when the police are using
> every resource they have to screw you in the civil court under the guise of
> being thorough and fair. And you see, that's the shoes you have to walk in
> when you're Margaret Rudin.

> She hung around, she was here for two years fighting this and she got
> crushed. She didn't become wealthy, she became a widow. After they stripped her
> of her dignity, after they stripped her of her possessions, they dispossessed her, took
> her car, threw her out of her home. After they had done everything they could to
> her they come in here with an arrogance, an arrogance and say find her guilty
> because she ran away? Find her guilty because she didn't want to subject herself to
> this again?

(ECF No. 69-6 at 131.)

[57] At a hearing held on May 9, 2001, on Rudin's motion to fire Amador, Rudin opined that Ron
may have had connections with the mob. (ECF No. 69-18 at 17.)

[58] Regarding Amador's effect on the jury, this court notes that Juror No. 11 wrote a letter several
years after the trial stating, inter alia, that (1) "Amador earned the reputation of an IDIOT among
the jurors," (2) Amador "was the laughing stock in the jury room," (3) "the majority of the jurors
chose to doodle on their notepads" even if Amador "was making a key point," and (4) "there were
jurors who flat out disregarded any points [Amador] attempted to make." (ECF No. 74-2 at 93.)

would have been different. <u>Strickland</u>, 466 U.S. at 694. Consequently, Amador's "conduct so undermined the proper functioning of the adversarial process that [Rudin's] trial cannot be relied on as having produced a just result." <u>Id.</u> at 686.

### F.     Grant of Relief

This Court finds that Rudin is entitled to habeas relief on Ground 1. The Court acknowledges that there are outstanding issues and allegations as to Amador's conflicts arising from media rights and other sources. However, the Court takes into consideration the time that has elapsed—over 20 years—since the trial in the case and the delay that would ensue were it to hold an evidentiary hearing on these remaining allegations. The Court thus finds that this case presents the unique situation in which equity favors granting of the petition on one narrow ground without resolving the remaining allegations as justice with respect to the gross inadequacy of trial counsel for Rudin has been delayed too long already in this case. This Court therefore rules on the same narrow basis as did the state post-conviction court. Even putting the allegations of a serious conflict of interest by Amador to the side, Rudin clearly was denied effective assistance of counsel due to the extreme lack of trial preparation by Amador and his ensuing self-absorbed, ill-prepared, and incompetent representation at trial. Accordingly, this Court proceeds to judgment, without any further delay, finding that Rudin has overcome the procedural default of her ineffective-assistance-of-trial-counsel claim under <u>Martinez</u> and is entitled to habeas corpus relief on Ground 1.

---

This court also notes, however, that Juror No. 11 also completed an affidavit several years earlier on July 17, 2001, in support of Rudin's motion for a new trial, in which she stated, <u>inter alia</u>, that she did not believe that the State provided its case beyond a reasonable doubt and that she changed her "vote because of other influences." (ECF No. 91-35 at 284.) Importantly, three other jurors provided affidavits refuting other allegations that Juror No. 11 made in her July 17, 2001, affidavit, thereby contesting Juror No. 11's credibility. (<u>See</u> ECF No. 70-19 at 3–10.)

Rudin also alleges that Jury Instruction Nos. 27 and 28 were improper, the state district court allowed inadmissible hearsay statements and "bad act" evidence, her appellate counsel failed to raise a severance issue and a jury misconduct issue on direct appeal, and the State improperly questioned Sharon. (ECF No. 100 at 111, 115, 117, 120, 125, 133, 139, 143.) Because Rudin is entitled to relief on ground 1 and because Rudin could obtain no greater relief than that to which she is entitled on ground 1—the vacating of her judgment—a  determination on these remaining claims is unnecessary. Blazak v. Ricketts, 971 F.2d 1408, 1413 (9th Cir. 1992) ("[W]hen habeas is granted on a conviction . . . , requiring the district court to resolve at one time all the issues raised in the petition could actually delay the proceedings unnecessarily and waste the district court's scare judicial resources."); see also Robbins v. Smith, 152 F.3d 1062, 1069 (9th Cir. 1997), rev'd on other grounds, 528 U.S. 259 (2000) ("If trial error is found to have occurred and to require vacation of the conviction, the appellate errors will become immaterial."); Rice v. Wood, 44 F.3d 1396, 1402 n.10 (9th Cir. 1995), vacated in part on other grounds, 77 F.3d 1138 (9th Cir. 1996) (en banc), cert. denied, 519 U.S. 873 (1996) ("[O]ur affirmance of the district court's granting of the writ on one sentencing issue effectively renders unnecessary any further consideration by the district court of the remaining penalty phase issues."). The Court also takes into account the equitable consideration as to delay noted previously in denying these grounds for relief without prejudice as moot.

In conclusion, this Court denies Rudin's remaining claims without prejudice as moot. This court, however, does grant a certificate of appealability on the dismissal of the remaining claims based on mootness.

**V.    CONCLUSION**

In accordance with the foregoing, **IT IS THEREFORE ORDERED**:

1.    The petition for a writ of habeas corpus, as amended, is conditionally granted and the judgment of conviction filed on September 17, 2001, in case number C142448 in the Eighth Judicial District Court for the State of Nevada hereby is vacated, and that Rudin shall be released from all custody and/or other restraints, including parole or other supervision, within thirty (30) days of the later of the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless the State through the respondents files a written election in this matter within that thirty (30) day period to retry Rudin and thereafter commences jury selection in the retrial within one hundred twenty (120) days following the election to retry Rudin, subject to reasonable requests for modification of the time periods in the judgment by either party pursuant to Rules 59 or 60.

2.    Rudin is granted a certificate of appealability with respect to all claims on which this court denies relief based on mootness.

3.    The Clerk of Court shall enter final judgment accordingly in favor of petitioner and against the respondents, conditionally granting the petition for a writ of habeas corpus as provided above and closing this case. It is this court's intention that the judgment entered pursuant to this order will be a final and appealable judgment.

4.    The Clerk of Court shall provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court, in connection with that court's case number C142448.

DATED: <u>May 15, 2022.</u>

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**